**In the matter of TCI 2 HOLDINGS, LLC, et al., Debtors.**

**No. 09–13654/JHW.**

United States Bankruptcy Court, D. New Jersey.

April 12, 2010.

124

Michael F. Walsh, Esq., J. Philip Rosen, Esq., Ted S. Waksman, Esq., Weil, Gotshal & Manges, LLP, New York, NY, for the Debtors.

Charles A. Stanziale, Jr., Esq., Jeffrey T. Testa, Esq., Lisa A. Bonsall, Esq., McCarter & English, LLP, Newark, NJ, for the Debtors.

Kristopher M. Hansen, Esq., Curtis C. Mechling, Esq., Erez E. Gilad, Esq., Stroock & Stroock & Lavan LLP, New York, NY, for the Ad Hoc Committee.

Kenneth A. Rosen, Esq., Jeffrey D. Prol, Esq., Lowenstein Sandler PC, Roseland, NJ, for the Ad Hoc Committee.

Thomas E. Lauria, Esq., Gerald Uzzi, Esq., Andrew C. Ambruoso, Esq., White & Case LLP, New York, NY, for Beal Bank.

Brian W. Hofmeister, Esq., Teich Groh, Trenton, NJ, for Beal Bank.

Jeffrey L. Jonas, Esq., Edward S. Weisfelner, Esq., Emilio Galvan, Esq., Daniel J. Saval, Esq., Brown Rudnick LLP, New York, NY, for the Icahn Partners.

Gilbert Brooks, Esq., Duane Morris LLP, Cherry Hill, NJ, for the Icahn Partners.

Paul R. DeFilippo, Esq., Wollmuth Maher & Deutsch LLP, Newark, NJ, for Donald J. Trump and Ivanka Trump.

David M. Friedman, Esq., Robert M. Novick, Esq., Daniel N. Zinman, Esq., Kasowitz, Benson, Torres & Friedman LLP,

New York, NY, for Donald J. Trump and Ivanka Trump.

Martha Hildebrandt, Esq., Jeffrey M. Sponder, Esq., United States Department of Justice, Office of the United States Trustee, Newark, NJ, for the United States Trustee.

**OPINION ON CONFIRMATION**

JUDITH H. WIZMUR, Chief Judge.

**Table of Contents**

| | Page |
|---|---|
| I. Facts and Procedural History | 128 |
| II. Overview of Reorganization Plans | 130 |
| A. The AHC/Debtor Plan | 130 |
| B. The Beal/Icahn Plan | 131 |
| III. Confirmation Requirements | 131 |
| IV. The AHC/Debtor Plan | 132 |
| A. Section 1129(a)(1) | 132 |
| 1. Classification | 133 |
| 2. Releases, Exculpation Clauses and Indemnification | 133 |
| a. The DJT Settlement Agreement | 134 |
| b. Intercreditor Agreement Releases | 139 |
| (i) Alleged Section 510(a) Violation | 139 |
| (ii) Release of Breach of Contract Claims | 141 |
| c. Indemnification of the Backstop Parties | 142 |
| B. Section 1129(a)(3) | 142 |
| C. Section 1129(a)(4) | 145 |
| 1. Authorization for Payment of Fees | 146 |
| 2. Reasonableness | 147 |
| 3. Backstop Stock | 147 |
| D. Section 1129(a)(11) | 148 |
| 1. Servicing the New Term Loan | 149 |
| a. Debtors' Projected EBITDA | 149 |
| (i) Capex Spending Reduction | 149 |
| (ii) Competitive Forces, including Pennsylvania Table Games | 150 |
| (iii) Historical Performance of the Debtors | 151 |
| b. Ability to Service the New Term Loan | 152 |
| 2. Debt Capacity | 153 |
| 3. Compliance With Regulatory Framework | 154 |
| 4. General Feasibility Considerations | 156 |
| E. Section 1129(b) | 156 |
| 1. Unfair Discrimination | 157 |
| 2. Fair and Equitable | 158 |
| a. Retention of Liens by the First Lien Lender | 159 |
| b. Value of the Lender's Secured Interest in the Collateral | 160 |
| c. Present Value | 162 |
| (i) Market Rate of Interest | 163 |
| (ii) New Term Loan Covenants | 166 |
| d. Is the Plan Otherwise "Fair and Equitable"? | 168 |
| V. The Beal/Icahn Plan | 169 |
| A. Section 1129(a)(1) | 169 |
| 1. Exculpation | 169 |
| 2. Indemnification | 170 |
| B. Section 1129(a)(2) | 170 |

 C. Section 1129(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .171
 D. Section 1129(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .172
 E. Section 1129(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .173
 F. Section 1129(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .174
 1. Commitment to Plan and Business Operations . . . . . . . . . . . . . . . . . . . . . . .174
 2. Trademark License and Serving Agreements . . . . . . . . . . . . . . . . . . . . . . . . .175
 3. Regulatory Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .175
 a. Undue Economic Concentration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .175
 b. Anti–Trust Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .177
 G. Section 1129(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .178
 H. Indenture Trustee Objection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .179

VI. Other Joint Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .179
 A. Former Shareholder Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .179
 B. Kahn Objection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .181

VII. Competing Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .181

Before the court for consideration are two competing Chapter 11 plans of reorganization, the Ad Hoc Committee/Debtors' Supplemental Modified Sixth Amended Plan ("AHC/Debtor Plan") and the Beal Bank/Icahn Partners Fifth Amended Joint Plan ("Beal/Icahn Plan"). For the reasons expressed below, I conclude that both plans are confirmable, with certain modifications, and that the AHC/Debtor Plan will be confirmed.

## I. *Facts and Procedural History.*

Faced with declining gaming revenues and a failure to make a required interest payment due on December 1, 2008 on certain Second Lien Notes, TCI 2 Holdings, LLC and nine subsidiary and other affiliated entities[1] (referred to jointly as the "debtors" or "TER") each filed voluntary petitions for relief under Chapter 11 of the

Bankruptcy Code on February 17, 2009. An order jointly administering the cases was entered on February 18, 2009. The debtors continue to operate as debtors-in-possession.

The debtors own or manage three hotel casino properties in Atlantic City, New Jersey known as the Trump Taj Mahal Casino Resort, the Trump Plaza Hotel and Casino and the Trump Marina Hotel.[2] The Taj Mahal offers 2,027 guest rooms, 200 table games and 3,160 slot machines. It is one of the largest facilities in Atlantic City. The Trump Plaza includes 900 hotel rooms, 95 table games and 2,115 slot machines. The Trump Marina has 728 guest rooms, 70 table games and 1,980 slot machines. The three casinos comprise approximately 21% of the gaming positions, hotel rooms and gaming revenues in the Atlantic City market.

---

**1.** The other debtor entities include: Trump Entertainment Resorts, Inc. (TER), Trump Entertainment Resorts Holdings, L.P., Trump Entertainment Resorts Funding, Inc., Trump Entertainment Resorts Development Co., LLC, Trump Taj Mahal Associates LLC d/b/a Trump Taj Mahal Casino Resort, Trump Plaza Associates, LLC d/b/a Trump Plaza Hotel and Casino, Trump Marina Associates, LLC d/b/a Trump Marina Hotel Casino, TER Management Co., LLC, and TER Development Co., LLC.

**2.** Trump Entertainment Resorts, Inc. ("TER") is a publicly held company and general partner of TER Holdings, which owns the three casinos. The predecessor entity to TER was Trump Hotels & Casino Resorts, Inc. ("THCR"). THCR, along with its various affiliates and subsidiaries, filed voluntary petitions under Chapter 11 of the Bankruptcy Code on November 21, 2004, jointly administered under case number 04–46898/JHW, and emerged with a confirmed plan on April 5, 2005, with an Effective Date of May 20, 2005.

As of the date of filing, debtors owed approximately $488 million on the First Lien debt held by Beal Bank ("First Lien Lender Claims"),[3] $1.25 billion in Second Lien Notes bearing interest at 8.5% per year, and approximately $39.3 million in general unsecured claims.[4] The First Lien Credit Facility was executed on December 21, 2007, has a first priority security interest on substantially all of the debtors' assets, and matures on December 21, 2012.

On August 3, 2009, during the debtors' extended exclusivity period, 11 U.S.C. § 1121(b), the debtors filed a proposed Chapter 11 reorganization plan and disclosure statement. The plan, supported by the First Lien Lender and Donald J. Trump, proposed a revised debt structure for the First Lien Lender, and afforded Trump, former Chairman of the debtors' Board of Directors,[5] and Beal Bank the exclusive right to acquire 100% of the equity in exchange for a financial contribution of $100 million to the Reorganized Debtors.

On August 11, 2009, the Ad Hoc Committee of Second Lien Note Holders ("AHC")[6] moved to terminate the debtors'

exclusivity period.[7] The motion terminating exclusivity was granted by an order entered August 31, 2009, and the AHC filed its first plan of reorganization. Trump elected to terminate his earlier arrangement with Beal Bank on November 16, 2009, whereupon he entered into an agreement with the AHC (the "DJT Settlement Agreement") to support the AHC's proposed plan. The DJT Settlement Agreement provided Trump and his daughter, Ivanka, the Trump Organization, LLC, Ace Entertainment Holdings, Inc. and other associated affiliates (the "DJT Parties") with 5% of the Reorganized Debtors' New Common Stock, warrants for an additional 5% and certain releases. In exchange, the DJT Parties agreed to enter into an Amended Trademark License Agreement and an Amended Services Agreement with the debtors, and agreed to waive their claims against the debtors' estates. On December 3, 2009, the debtors announced their support of the AHC/Trump plan, and became a joint proponent.

On December 4, 2009, Beal Bank filed an independent disclosure statement and

---

**3.** Beal Bank refers to Beal Bank, S.S.B. and Beal Bank Nevada collectively.

**4.** A critical vendor program which paid approximately $21 million to various trade creditors under certain conditions was approved by the court by an amended order entered June 16, 2009.

**5.** By letter dated February 13, 2009, Trump resigned from the debtors' Board of Directors and notified TER that he was abandoning his 23.5% direct limited partnership interest in TER Holdings and relinquishing his limited partnership rights.

**6.** Following the debtors' default on the interest payment due on December 1, 2008 on the Second Lien Notes, an Ad Hoc Committee of Second Lien Note Holders was formed to review and negotiate a possible restructuring of the TER liabilities and equity interests. The Committee represented holders of ap-

proximately 61% of the principal amount of the outstanding Second Lien Notes. The Ad Hoc Committee includes Avenue Capital Management, Brigade Capital Management, Continental Casualty Company, Contrarian Capital Management, LLC, Gold Tree Asset Management, LP, MFC Global Investment Management, LLC, Northeast Investors Trust, Oaktree Capital Management, LP, and Polygon Investment Partners.

**7.** AHC also sought the appointment of an examiner. On September 15, 2009, the court entered an order appointing an examiner to "investigate the negotiating process on the selection of the Beal/Trump plan, the considerations of the Debtors in terms of the desirability of that plan over the Ad Hoc Committee's plan, how that process went forward and the role of Mr. Trump in that context."

proposed plan of reorganization. Less than a week later, on December 10, 2009, Icahn Partners[8] purchased 51% of the First Lien Lenders' claims from Beal Bank. The funds to purchase the remainder of the claims were placed in escrow pending activation of a put/call agreement between Icahn and Beal Bank, whereby Icahn would become the sole owner of the First Lien Lender claims. Icahn agreed to become a co-proponent with Beal Bank to advance their joint reorganization plan.

Over the last three months, the plans proposed by both groups have undergone extensive revision. The AHC/Debtors' proposed plan is now in its sixth supplemental amended version and the Beal Bank/Icahn plan is in its fifth modified version. An overview of each plan follows.

## II. *Overview of Reorganization Plans.*

### A. *The AHC/Debtor Plan.*

The Ad Hoc Committee and the debtors filed a Supplemental Modified Sixth Amended Plan on March 9, 2010. The plan proposes to contribute $225 million in new equity capital from a "Rights Offering",[9] representing 70% of the New Common Stock, backstopped by certain Second Lien Noteholders who will receive 20% of the New Common Stock as a "Backstop Fee" in consideration for the Backstop Agreement.

Under the AHC/Debtor Plan, in exchange for the $488 million in currently outstanding First Lien Lender claims,[10]

the First Lien Lenders will receive: (a) $125 million from the Rights Offering as a loan repayment; (b) a New Term Loan in the principal amount of the debtors' valuation of the enterprise, $459 million, minus the $125 million from the Rights Offering, payable at a market rate of interest (now asserted to be 11%) in accordance with the terms and conditions contained in the Amended and Restated Credit Agreement; (c) 100% of the net proceeds from any sale of the Trump Marina, or the right to credit bid, and (d) 100% of the equity interests in TCI 2 (unless the First Lien Lenders determine not to accept that distribution). The Second Lien Noteholders will receive an equity distribution equal to their pro rata share of 5% of the New Common Stock. The General Unsecured Creditors will receive cash in an amount equivalent to the pro rata share of New Common Stock received by the Noteholders. In addition, accredited investors who hold either General Unsecured claims or Second Lien Note claims will receive a pro rata share of subscription rights to acquire up to 70% of the New Common Stock in the Reorganized Debtors, or the cash equivalent of such subscription rights. The convenience class receives a cash recovery equal to a pro rata share of $500,000.

The plan also provides the DJT Parties with stock, warrants, releases and the reimbursement of certain professional fees in exchange for their waiver and settlement of all claims and interests against the debt-

---

**8.** Icahn Partners refers jointly to Icahn Partners LP, Icahn Partners Master Fund LP, Icahn Partners Master Fund II LP, and Icahn Partners Master Fund III LP.

**9.** The "Rights Offering" is defined in the AHC/Debtor Plan to mean "the offering of Subscription Rights to purchase 7,500,000 shares of New Common Stock to be issued by Reorganized TER pursuant to the Plan to the

Rights Offering Participants, for an aggregate purchase price equal to" $225,000,000. AHC/Debtor Plan, ¶¶ 1.105 and 1.106.

**10.** Since the commencement of the case, some adequate protection payments made by the debtors have been applied to the principal of the First Lien Lender claims, reducing the principal to approximately $483 million at the time of confirmation.

ors and the AHC,[11] and their agreement to enter into an Amended Trademark License Agreement and an Amended Services Agreement.

By separate motion, the debtors have proposed to enter into debtor-in-possession ("DIP") financing with certain members of the Ad Hoc Committee if the AHC/Debtor Plan is confirmed. The DIP facility would total $45 million, with no fees, a 10% interest rate and a maturity date no later than five months after confirmation. When the plan becomes effective, the remaining $100 million from the Rights Offering (after payment of $125 million to the First Lien Lenders) will be available to the Reorganized Debtors for payment of administrative claims and working capital.

The AHC/Debtor Plan requires the filing of professional fee applications in the normal course with review by the bankruptcy court. The plan seeks to exempt certain fees from this review process by providing that the debtors shall pay on the effective date the reasonable and documented fees and expenses of the AHC Advisors, the Backstop fees and expenses, and the Second Lien Indenture Trustee's fees and expenses without application to or review by the bankruptcy court, unless the parties are unable to agree on the amount to be paid. The plan also provides for certain injunctions, releases and indemnification, as discussed below.

### B. The Beal/Icahn Plan.

Beal Bank and Icahn Partners filed a Fifth Modified Joint Plan of Reorganization on February 23, 2010. The plan is premised upon the complete deleveraging of the debtors' debt by the conversion of the entire amount of the First Lien debt into equity. The Second Lien Note claims and the General Unsecured Creditors will not receive a distribution.[12] The plan sets aside $500,000 for a class of convenience claims comprised of general unsecured claims other than the Second Lien deficiency claims.

In addition, the Beal/Icahn Plan provides for a $45 million DIP loan to bridge the debtors' liquidity needs between confirmation and the effective date of the plan. The loan converts to equity on the effective date of the plan. The plan also provides for an additional contribution of $80 million in equity to be made by Icahn Partners on the effective date of the plan. Beyond these cash outlays, the proponents have committed $50 million in escrow, to be forfeited to the debtors' estates if regulatory approvals are not obtained within 270 days of the confirmation date. As does the AHC/Debtor Plan, the Beal/Icahn Plan provides for certain injunctions, releases and indemnification provisions, as discussed further below.

### III. Confirmation Requirements.

"To decide which reorganization plan to confirm, a court must first determine whether one or more of the proposed plans is confirmable." *Mercury Capital Corp. v. Milford Connect. Assoc., L.P.*, 354 B.R. 1, 6 (D.Conn.2006). The require-

---

**11.** Donald and Ivanka Trump have filed proofs of claim asserting at least $100 million in damages for alleged breaches of the Trademark License Agreement and damage to the Trump trademarks, brand and reputation.

**12.** The plan proposed to pay to the Second Lien Noteholders and the allowed General Unsecured Creditors a pro rata share of $13,937,300 in cash, along with certain sub-scription rights, but only if the AHC/Debtor Plan was withdrawn or otherwise failed before a contested confirmation hearing was held. Because contested hearings were held to consider both plans, this provision was triggered to deny the Second Lien Note claims and General Unsecured Creditors any recovery under the Beal/Icahn Plan.

ments for confirmation of a proposed Chapter 11 plan of reorganization are listed in 11 U.S.C. § 1129. The proponent of each plan bears the burden of establishing their plan's compliance with each of these requirements. *See In re Danny Thomas Properties II L.P.*, 241 F.3d 959, 963 (8th Cir.2001); *In re Charter Communications*, 419 B.R. 221, 243 (Bankr.S.D.N.Y.2009); *In re Hurricane Memphis, LLC*, 405 B.R. 616, 624 (Bankr.W.D.Tenn.2009). The court has an independent duty under the Bankruptcy Code to determine whether a plan satisfies each element of section 1129, even in the absence of objections to confirmation. *In re H.H. Distributions, L.P.*, 400 B.R. 44, 50 (Bankr.E.D.Pa.2009); *In re MJ Metal Products, Inc.*, 292 B.R. 702, 704 (Bankr.D.Wyo.2003).

■ If the proponent can demonstrate that its plan satisfies all of the elements of section 1129(a), as applicable, the court must confirm the consensual plan. *In re Armstrong World Industries, Inc.*, 432 F.3d 507, 511 (3d Cir.2005). A nonconsensual plan requires the proponent to satisfy all but one of the sixteen elements, that all classes consent or are unimpaired, 11 U.S.C. § 1129(a)(8), plus the additional requirements of section 1129(b), including that the plan does not unfairly discriminate against dissenting classes and that the dissenting classes are treated fairly and equitably. *Id.* at 511–12. Both plans in this case are nonconsensual.

We will address each of the contested elements of section 1129(a) and (b) with respect to each plan. As a threshold matter, we note that subsections 1129(a)(6) (approval of rate changes), (14) (domestic support obligations), (a)(15) (individual debtors) and (a)(16) (nonprofit entities) do not apply here, and that there is no challenge to the compliance by both plans with

subsections 1129(a)(5) (directors and officers), (a)(7) (best interest of creditor), (a)(10) (acceptance by impaired class), (a)(12) (28 U.S.C. § 1930 fees) and (a)(13) (retiree benefits). I can readily conclude that each plan satisfies these requirements.

### IV. *The AHC/Debtor Plan.*

As to the AHC/Debtor Plan, the disputed section 1129 elements include 1129(a)(1), (a)(3), (a)(4), (a)(11) and 1129(b).[13]

### A. *Section 1129(a)(1).*

The first requirement of section 1129(a) is that the plan must comply with "the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). The legislative history reflects that "the applicable provisions of chapter 11 [include sections] such as section 1122 and 1123, governing classification and contents of plan." H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6368, 5787, 5912. *See In re G–1 Holdings Inc.*, 420 B.R. 216 (D.N.J. 2009) (applicable provisions includes section 1122 and 1123); *In re Burns and Roe Enterprises, Inc.*, No. 08–4191, 2009 WL 438694, *23 (D.N.J. Feb.23, 2009); *In re Journal Register Co.*, 407 B.R. 520, 531–32 (Bankr.S.D.N.Y.2009). Release and exculpation clauses have also been found to be subject to review pursuant to section 1129(a)(1). *See, e.g., In re Whispering Pines Estates, Inc.*, 370 B.R. 452, 459 (1st Cir. BAP 2007); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 774 (Bankr. N.D.Tex.2007). Our focus here is drawn to the classification schemes and the non-

---

**13.** Sections 1129(a)(2) (compliance by plan proponents) and (a)(9) (payment of priority claims) have not been challenged and are established on this record.

debtor third party releases provided for under the AHC/Debtor Plan.

### 1. *Classification.*

█ Section 4.4 of the AHC/Debtor Plan classifies holders of allowed Second Lien Note claims in Class 4. Section 5.4(h) offers a group of Second Lien Noteholders, in consideration for their agreement to backstop the Rights Offering contained in the plan, the receipt of 20% of the equity in the Reorganized Debtors. The Backstop Parties are all holders of Second Lien Note claims, and are all members of the Ad Hoc Committee. The Icahn parties, who not only hold First Lien Lender claims, but also hold Second Lien Note claims, contend that the plan proposes disparate treatment of claim holders in the same class, in violation of the equality of treatment required in section 1123(a)(4), because the AHC/Debtor Plan affords only certain Second Lien Noteholders the opportunity to serve as Backstop Parties to the Rights Offering and to receive 20% of the New Common Stock of the Reorganized Debtors.

Section 1123 requires, in pertinent part, that "a plan shall—designate, subject to section 1122 of this title, classes of claims," and shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(1), (a)(4).[14] The contention of the Icahn parties that the AHC/Debtors' plan classification scheme unfairly discriminates against certain noteholders depends upon the desig-

nation of the Backstop Fee connected with the plan's Rights Offering as a distribution on account of the Backstop Parties' status as holders of Second Lien Note claims.

Here, all holders of allowed Second Lien Note claims are classified together, and receive the same treatment on account of their claims. The Backstop Fee proposed to be paid to the Backstop Parties is not a distribution to the Second Lien Noteholders on account of their Second Lien Note claims. Rather, the Backstop Fee is offered as consideration for the $225 million commitment made by the Backstop Parties, which will be paid only if the $225 million is funded. There is no violation of the classification mandate of § 1123(a)(4).

### 2. *Releases, Exculpation Clauses and Indemnification.*

The AHC/Debtor Plan contains various releases, exculpation clauses and indemnification provisions, three of which have generated objections.[15] First, the debtors seek approval, pursuant to Rule 9019, of the "DJT Settlement Agreement",[16] which includes various releases in favor of the DJT Parties, the cancellation of any claims associated with the Trump Personal Guaranty, and a waiver and release by the DJT Parties of any claims that they might have arising from the license and service agreements dated May 20, 2005. *See* AHC/Debtor Plan, § 5.9 Waiver of Claims by the DJT Parties; § 5.11 Cancellation of Existing Securities and Agreements. Second, the AHC/Debtor Plan provides for the settlement and release of all contractual, legal and equitable subordination

---

**14.** Section 1122(a) allows a claim or interest to be placed in a particular class "only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).

**15.** The releases specified in ¶ 10.5 of the AHC/Debtor Plan were not objected to by any party, and appear to be consistent with appli-

cable law. *See, e.g., In re PWS Holding Corp.,* 228 F.3d 224, 246–47 (3d Cir.2000). The objection by the UST to ¶ 10.6 of the AHC/Debtor Plan has been resolved.

**16.** The "DJT Settlement Agreement" is also referred to in the plan as the "Plan Support Agreement."

claims, presumably impacting upon the Intercreditor Agreement between the First Lien Lenders and the Second Lien Noteholders. *See* § 5.2 Settlement of Certain Claims.[17] Finally, the AHC/Debtor Plan provides for an indemnification provision for the Backstop Parties. *See* § 5.4(n) Indemnification of Backstop Parties.

a. *The DJT Settlement Agreement.*

On November 16, 2009, the Ad Hoc Committee and the DJT Parties entered into the "DJT Settlement Agreement." Pursuant to this Agreement, the DJT Parties agreed to promote the approval of the AHC Disclosure Statement and to vote for and support the AHC Plan. Shortly after the Agreement between the AHC and the DJT Parties was entered into, the debtors determined to become co-proponents of the AHC plan. The Agreement was incorporated into and made part of the plan.[18]

As provided in Schedule A of the Agreement, the DJT Parties specifically agreed to:

(1) enter into an Amended and Restated License Agreement (with respect to Donald and Ivanka Trump) and an Amended and Restated Services Agreement (with respect to Donald Trump);

(2) immediately suspend all discovery and litigation against the AHC in connection with the plan;

(3) waive entitlement to any additional consideration or indemnification from the debtors on account of any existing agreements with the debtors, except to the extent of any Directors and Officers' Insurance, and

(4) cancel and release any and all claims, including Administrative Expense claims, against or equity interest in the debtors as of the effective date of the AHC/Debtor Plan.

Debtors' Exh. 6 at A–1. In exchange, the DJT Parties are to receive:

(1) 5% of the New Common Stock;

(2) warrants to purchase up to an additional 5% of the New Common Stock, exercisable for a 5 year period;

(3) releases in the Agreement and in the AHC/Debtor Plan of Donald J. Trump from all personal liabilities or obligations in connection with the Trump Personal Guaranty;

(4) mutual releases by and among the DJT Parties and by the debtors, and

(5) the payment of the reasonable professional fees of the DJT Parties, as specified.

*Id.* at A–1–2. In the event that the court determines that the AHC/Debtor Plan containing the terms of the DJT Settlement Agreement is not confirmable, the AHC has agreed to assign to Trump all of the rights associated with the claims against any of the DJT Parties that would have been released had the terms of the Agreement and plan been approved, and to direct the Indenture Trustee to release the Trump Personal Guaranty. In addition, the DJT Parties agreed to cooperate with the debtors in connection with the Florida litigation,[19] in exchange for the reimbursement of their reasonable fees and costs generated from their involvement. *Id.* at A–3.

---

17. *See* Beal Bank/Icahn Exh. 24 "Amended and Restated Intercreditor Agreement."

18. *See* Paragraphs 5.2, 10.5 and 10.6 of the AHC/Debtor Plan.

19. The Florida litigation refers to the lawsuit entitled *Trump Hotels & Casino Resorts Dev.*

*Co., LLC v. Richard T. Fields, Coastal Dev., LLC, Power Plant Enter., LLC, Native American Dev., LLC, Joseph S. Weinberg and the Cordish Co.,* case number 04–20291, pending in the Circuit Court for Seventh Judicial Circuit in Broward County, Florida.

The Trump Personal Guaranty ("Guaranty") refers to the guaranty executed on December 22, 2005 by Trump in favor of the holders of the 8½% Senior Secured Notes due 2015, now referred to as the Second Lien Noteholders. Trump agreed to guaranty the collection of $250 million in outstanding principal due under the Notes in the event of the foreclosure on the collateral, the transfer of a deed in lieu of foreclosure or sale of the collateral, after exhaustion of all remedies against the issuers and Indenture Guarantors.[20] The Guaranty provides that the Required Noteholders [21] and the Indenture Trustee, on behalf of the Guarantied Parties, have the authority to "settle, release, compromise … the Guarantied Obligations" and to "release … any one or more other guarantors … as such Guarantied Parties or the Trustee (as applicable) may elect in their or its sole discretion," *id.* at ¶ 3(a)(v, vi), "without discharging or otherwise affecting the enforceability of the obligations of Guarantor hereunder." *Id.* at ¶ 3(a).

The Beal/Icahn parties challenge the debtors' business judgment that the DJT Settlement Agreement is in the best interests of the debtors' estate and that it survives a Rule 9019 review. They also contend that the releases proposed in the Agreement fail to satisfy the test for nondebtor third party releases articulated by the Third Circuit in *In re Continental Airlines*, 203 F.3d 203 (3d Cir.2000). They assert that the DJT Parties are unfairly receiving substantial consideration in exchange for limited trademark licensing and service agreements and the release of questionable claims against the debtors' bankruptcy estates. They maintain that

the original Trump licensing agreement has not terminated, and that it is fully assumable by the debtors. Therefore, the proposed new agreements are not only insufficient but also unnecessary. They also highlight the provisions for the payment of all DJT Parties' legal fees, and for releases to the DJT Parties from claims relating to (1) adverse tax consequences resulting from abandoning their partnership interests; (2) alleged fraudulent conveyances; (3) recovery under the Trump Personal Guaranty, and (4) termination of the existing licensing and services agreements. In their opinion, the proposed settlement agreement is not a fair arrangement for the debtors' estate.

■ Section 1123(b)(3)(A) expressly states that a plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). *See In re Arden*, 176 F.3d 1226, 1228 (9th Cir.1999) (section 1123(b)(3)(A) allows a court to approve a claim compromise as part of a plan); *In re G–1 Holdings Inc.*, 420 B.R. 216, 256 (D.N.J.2009). "[T]he standards for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed.R.Bankr.P. 9019." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr.D.Del.2008). *See also In re Heritage Organization, L.L.C.*, 375 B.R. 230, 308 (Bankr.N.D.Tex.2007) (court has authority to approve a plan that includes settlement of a claim against the estate).

■ Rule 9019 authorizes the court, on motion, and after notice and a hearing, "to approve a compromise or settlement."

---

**20.** Debtors' Exh. 13 at 2, ¶ 1.

**21.** "Required Noteholders" is a term defined under the Indenture to mean: "(A) prior to May 20, 2006, Holders of more than 66–2/3% of the principal amount of Notes then out-

standing and (B) on or after May 20, 2006, Holders of more than 50% of the principal amount of Notes then outstanding." Beal Bank/Icahn Exh. 7 at 21.

Fed.R.Bankr.P. 9019. "Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them." *In re Nutraquest, Inc.,* 434 F.3d 639, 644 (3d Cir.2006). Ultimately, the court must determine whether the settlement falls within the lowest range of reasonableness. *See, e.g., In re G–1 Holdings Inc.,* 420 B.R. 216, 256 (D.N.J.2009). To approve a settlement pursuant to Rule 9019, the court must balance: " '(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.' " *In re WebSci Technologies, Inc.,* 234 Fed.Appx. 26, 29 (3d Cir.2007) (quoting *In re Martin,* 91 F.3d 389, 393 (3d Cir.1996)). In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). "Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, i.e., the parties who did not settle." *Nutraquest,* 434 F.3d at 645. The burden is on the proponent to establish that the settlement may be approved. *See In re Grand Prix Associates Inc.,* No. 09–16545, 2009 WL 1850966, *5 (Bankr.D.N.J. June 26, 2009).

█ It is certainly true that the DJT Parties are receiving substantial consideration in exchange for the release of their claims against the debtors, and for their willingness to enter into a new Trademark License Agreement and new Services Agreement. The value of the 5% of the new equity and the warrants to acquire an additional 5% of the equity is not clear. The release by the DJT Parties of their claims against the debtors is not meaningful to the estates, since prepetition claims and interest would be treated as other such claims and interests under the plan, receiving a nominal pro rata distribution with other claimants. The DJT Parties have asserted administrative claims, which are also being released, but the full extent of these claims has not been established on this record.[22]

The critical component of the DJT Settlement Agreement is the resolution of the issues regarding the Trademark License Agreement and the Services Agreement. While the Beal/Icahn parties contend that the agreements are assumable by the debtors, there is legitimate debate about whether the agreements terminated, and whether the contracts may be assumed. There is significant value to the debtors and to the AHC proponents of the plan in the certainty of the retention of the Trump brand for the benefit of the Reorganized Debtors. Most significantly, the proponents of the AHC/Debtor Plan established at confirmation hearings that the Trump brand is worth millions of dollars to the debtors. The Trump Organization operates prominently worldwide. The debtors' identification with the Trump Organization raises its profile in the gaming industry. While certain aspects of the new agreement are less favorable to the debtors than

---

**22.** Among other claims, Mr. Trump has asserted claims: (1) of $100 million for breach of the License Agreement; (2) for unpaid fees related to the Service Agreement; (3) for unpaid amounts related to his former position as Chairman of the Board of TER; (4) for unpaid tax distributions as a limited partner of TER; (5) for indemnification, subrogation, reimbursement and contribution pursuant to the Agreements, and (6) for reimbursement and contribution pursuant to the Directors and Officers' Insurance under the Agreements.

the original agreements, the perpetual, royalty-free license of the continued use of the name and likeness of Donald Trump, the newly established right to use the name and likeness of Ivanka Trump, and the restrictive covenant imposed on the Trump Parties to prohibit the use of the Trump brand in connection with casino or gaming activities in New Jersey and six adjacent states all tilt the balance in favor of approving the settlement as being in the paramount interest of the Reorganized Debtors. When we examine the fairness of the settlement to other persons, i.e., the parties who did not settle, we see no unfairness in the willingness of the AHC members to carve out a piece of the reorganized equity in exchange for the anticipated benefits of the modified agreements with the Trump Parties. I conclude that, with the exception of the releases offered to the DJT Parties discussed below, the settlement as proposed falls within the permissible range of reasonableness established by Rule 9019 jurisprudence.

■■■ The Beal/Icahn parties validly express concern that certain releases contained in the DJT Settlement Agreement and incorporated in the AHC/Debtor Plan do not meet confirmation requirements. Utilizing the Rule 9019 procedure, which entitles the debtors to some deference to their business judgment, does not immunize the settlement provisions from meeting confirmation requirements, and cannot serve as an "end run around the Bankruptcy Code." *In re Congoleum Corp.*, No. 03–51524, 2009 WL 499262, *8 (Bankr.D.N.J. Feb.26, 2009), *aff'd in part, rev'd in part*, 414 B.R. 44 (D.N.J.2009) ("Parties may not do an end run around the Bankruptcy

Code by calling something a settlement."). *See also In re Iridium Operating LLC*, 478 F.3d 452, 463 (2d Cir.2007); *In re Whispering Pines Estates, Inc.*, 370 B.R. 452, 460 (1st Cir. BAP 2007) (a broad release of the plan proponent included as an "implicit" settlement in the plan was reviewed as both a settlement and as a plan provision for a non-debtor release).

■■■ The release primarily implicated here is the release of the Guaranty. The DJT Parties offer arguments to support the contention that Trump is not actually liable to the Second Lien Noteholders on the Guaranty,[23] and that the AHC is empowered to settle and release the Guaranty on behalf of the all Second Lien Noteholders. I need not resolve these contentions here. Clearly, the AHC members can settle with Trump to relieve him of personal liability to them. If Trump is not actually liable on the Guaranty otherwise, or if the AHC can settle and release him on behalf of all Noteholders, these proceedings will not impede the effectuation of the contract terms as between the AHC and Mr. Trump. The question is whether the plan provision offering Mr. Trump a release from the Guaranty, not on the basis of the contractual terms between the parties, but on the grounds necessary to support a non-debtor release of third party liability, is sustainable here.

Under § 524(e) of the Code, the "discharge of a debt of the debtor does not affect the liability of any other entity on ... such debt." 11 U.S.C. § 524(e). The circuits are split on whether § 524(e) proscribes a Chapter 11 plan provision which

---

**23.** Among the arguments offered to support the contention that Trump has no liability on the Guaranty are that the Guaranty does not apply where, as here, the debtors' assets are encumbered by a lien senior to the lien of the Second Lien Noteholders. In addition, the Guaranty is triggered upon a completed foreclosure on the debtors' assets by the Indenture Trustee. Because both competing plans propose to eliminate the Second Lien Notes and their liens, a foreclosure would not be possible.

offers releases and permanent injunctions to non-debtors from third party liability.[24]

Addressing the issue in *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000), the Third Circuit noted that there is no explicit authorization for the release and permanent injunction of claims against non-debtors in the Code. *Id.*[25] Without establishing a "blanket rule" on the validity of third-party releases and injunctions, the court reflected that even "the most flexible tests for the validity of non-debtor releases" look to certain "hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions," 203 F.3d at 214, as well as whether reasonable consideration had been given in exchange for the releases and the injunction. *Id.* The *Continental* court concluded that the plan before it could "not pass muster under even the most flexible tests for the validity of non-debtor releases," *Id.* at 214, because the record below contained no findings that the release and permanent injunction were fair to the parties whose claims were being released, and no findings that the releases were given in exchange for reasonable consideration. Nor was the necessity of the release and permanent injunction established, since the court found nothing in the record "to even imply that the success of the Continental Debtors' reorganization bore any relationship to the release and permanent injunc-

tion" sought. *Id.* at 215. The parties being released had not "provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability." *Id.* at 215. *See also United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir.2003) (in addition to a demonstration of fairness, necessity to the reorganization, and specific factual findings to support these conclusions, there must be evidence that the releases " 'were given in exchange for fair consideration.' "). Lacking sufficient evidentiary and legal basis, "the release and permanent injunction amounted to nothing more than a lockstep discharge of non-debtor liability and fall squarely into the section 524(e) prohibition." 203 F.3d at 217. *See also In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir.2000) (release of debtors, creditors committee and professionals for acts connected with the Chapter 11 cases was permissible, except for willful misconduct or gross negligence).

On this record, the AHC/Debtors have failed to establish sufficient facts to demonstrate that the release of the Guaranty is fair and necessary to the debtors' reorganization, or that fair consideration has been tendered in exchange for the release. The fairness of the release depends upon a showing of fairness to the third parties whose claims would be enjoined by opera-

---

**24.** The Fifth, Ninth and Tenth Circuits conclude that, with the exception of sections 524(g) and 1103(c), section 524(c) prohibits all non-debtor third party releases and permanent injunctions. *See, e.g., In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir.2009); *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995), *cert. denied*, 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 600 (10th Cir.1990), *modified by, Abel v. West*, 932 F.2d 898 (10th Cir.1991). The Second, Fourth and Sixth Circuits permit non-debtor releases in unique or "truly unusual" cases,

considering, among other things, whether creditors received consideration in exchange for the non-debtor releases. *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir.2005); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir.), *cert. denied*, 537 U.S. 816, 123 S.Ct. 85, 154 L.Ed.2d 21 (2002); *In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989).

**25.** The exception is the procedure for resolving asbestos claims. 11 U.S.C. § 524(g).

tion of the release. There are no channeling injunctions offered here as part of the plan, whereby the third parties whose potential claims are being released would achieve some benefit, and no other exceptional circumstances to warrant such relief. The fairness of the release has not been shown.

Nor has there been a demonstration of necessity for the release in connection with the debtors' reorganization. In fact, by the terms of the DJT Settlement Agreement, the release provisions are severable from the other provisions of the Agreement. The Agreement provides that if the release is not approved, then the AHC will assign its members' rights under the Personal Guaranty to Trump, and will direct the Indenture Trustee to release the Guaranty. As well, it must be noted that the release of the Guaranty is not necessary for the debtors' reorganization, because another potentially confirmable plan has been proposed which does not contain the release.

Most notably, Trump is not making a separate cash contribution to the debtors' estate or to its creditors in exchange for the release. Non-consenting Second Lien Noteholders cannot be bound to a release of the Guaranty on the basis of the plan provision providing for the release. The AHC/Debtor Plan is confirmable only if the release of the Trump Personal Guaranty is deleted from the plan.

b. *Intercreditor Agreement Releases.*

An Amended and Restated Intercreditor Agreement, dated December 21, 2007 (the "Intercreditor Agreement") was entered into between the First Lien Lenders and the Second Lien Noteholders. The Beal/Icahn parties contend that the AHC/Debtor Plan cannot be confirmed because it violates the Intercreditor Agreement and is therefore inconsistent with section 510(a) of the Bankruptcy Code, and because the plan seeks to release, on a nonconsensual basis, all of the First Lien Lenders' rights under the Intercreditor Agreement.

(i) *Alleged Section 510(a) Violation.*

The Beal/Icahn parties contend that the AHC/Debtor Plan violates the Intercreditor Agreement in at least two ways, causing the plan to be unconfirmable as violative of section 510(a). First, the Intercreditor Agreement provides that until the First Lien Obligations have been paid in full, in cash, no proceeds of the shared collateral shall be payable to the Second Lien Parties. If received by the Second Lien Parties, the proceeds must be turned over to the First Lien Lenders.[26] The Beal/Icahn parties contend that because the AHC/Debtor Plan proposes to make deferred cash payments to the First Lien Lenders, the First Lien Lenders are not being paid in full in cash. As a consequence, the receipt by the Second Lien Noteholders of cash, rights and other property under the plan violates the Agreement.

Second, the Intercreditor Agreement prohibits any Second Lien Noteholder from objecting to or contesting the payment of any adequate protection payments to the First Lien Lender, or contesting the status of its secured claims.[27] The AHC/Debtor Plan provides for the recharacterization of adequate protection payments made to the First Lien Lenders as payment of principal, which recharacterization would violate the Agreement. Any benefit received by the Second Lien Noteholders from such recharacterization

---

**26.** Intercreditor Agreement at 10, § 4.01.

**27.** Intercreditor Agreement at 11–12, §§ 5.01, 5.03.

would violate the priority position to which the parties agreed.[28]

Section 510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). *See, e.g., In re Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y.2009) (Intercreditor agreements are enforceable contracts under § 510(a), "and the Court will not disturb the bargained-for rights and restrictions governing the second lien debt".).

The Second Lien Noteholders offer various defenses to the Beal/Icahn contention that the Intercreditor Agreement is being violated by the terms of the reorganization plan, including an express reservation of rights to the Noteholders to vote their claims for or against any plan of reorganization, and the right to "exercise rights and remedies as unsecured creditors against the Credit Parties." [29] They highlight the fact that nothing in the Intercreditor Agreement proscribes the filing by the Second Lien Noteholders, acting as unsecured creditors, of a plan of reorganization.

Several days before the start of confirmation hearings in this matter, in February 2010, the First Lien Lenders filed a New York state court law suit against members of the AHC, seeking a declaratory judgment and damages for alleged breach by the AHC members of the Intercreditor Agreement. The AHC members removed the action to United States District Court for the Southern District of New York. Beal Bank has moved to remand the action to state court, and the AHC members have moved to transfer venue to this court. The AHC members invite this court to determine whether the Intercreditor Agreement was breached by the AHC actions taken in this case.

Given the context in which the issue is presented, i.e., the confirmability of the AHC/Debtor Plan under § 1129(b)(1), I need not accept the AHC invitation. My attention is properly called by the AHC to the introductory phrase of § 1129(b)(1), "notwithstanding section 510(a) of this title." 11 U.S.C. § 1129(b)(1).[30] We have not found cases analyzing the import of this phrase upon a cramdown plan which arguably subverts a pre-petition subordination agreement between creditors. *See* 4 Lawrence P. King, Collier on Bankruptcy, ¶ 510.03[3] at 510–10 n. 20 (16th Ed.2009) ("[t]he courts have not yet resolved whether a plan may modify a subordination agreement through the cramdown mechanism of section 1129(b)."). In a 1995 article detailing recommendations for amendments to the Bankruptcy Code, Kenneth N. Klee noted that there is a lack of certainty under current law about whether a consensual plan under § 1129(a) can override a contractual subordination provision and permit a majority within a class to compel the minority in the class to

---

28. The quest by the proponents of the AHC/Debtor Plan for recharacterization of adequate protection payments made to the First Lien Lender will be resolved as of the Effective Date of the Plan.

29. Intercreditor Agreement at 9–10, § 3.07.

30. In its entirety, section 1129(b)(1) provides: (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
11 U.S.C. § 1129(b)(1).

waive subordination rights. Section 1129(a)(1) requires a plan to conform to the provisions of Title 11, including § 510(a), which makes subordination agreements enforceable in bankruptcy to the same extent such agreements are enforceable outside of bankruptcy. Klee suggests that § 1123(b) be amended to permit a consensual plan to override § 510(a). Turning to § 1129(b)(1), he notes:

> § 1129(b), by virtue of its reference to § 510(a) in cramdown, appears to have the anomalous result of overriding § 510(a) and eliminating the enforcement of subordination agreements in cases in which the class rejects the plan. The Commission should recommend to Congress that the reference to § 510(a) in § 1129(b)(1) of the Bankruptcy Code be deleted.

Kenneth N. Klee, Adjusting Chapter 11: Fine Tuning the Plan Process, 69 AM. BANKR.L.J. 551, 561 (1995). While Klee's comments criticizing the "anomalous result" occasioned by the clause are understood, Congress has neither amended § 1123(b) to specifically permit a consensual plan to override § 510(a), nor deleted the reference to § 510(a) in § 1129(b)(1). The phrase must be given meaning.

The term "notwithstanding" is "one of the most frequently used and misunderstood words in the legal vocabulary." *Goody's Family Clothing, Inc.,* 392 B.R. 604, 606 (Bankr.D.Del.2008), *aff'd,* 401 B.R. 656 (D.Del.2009). The only logical reading of the term "notwithstanding" in section 1129(b)(1) seems to be: "Even though section 510(a) requires the enforceability of subordination agreement in a bankruptcy case to the same extent that the agreement is enforceable under nonbankruptcy law, if a nonconsensual plan meets all of the § 1129(a) and (b) requirements, the court 'shall confirm the plan.'" The phrase "[n]otwithstanding section 510(a) of this title" removes section 510(a) from the scope of 1129(a)(1), which requires compliance with "the applicable provisions of this title." 11 U.S.C. § 1129(b)(1).

I do not decide here whether the Second Lien Noteholders have violated the Intercreditor Agreement, but even if such a violation occurred, it would not impede the confirmation of the AHC/Debtor Plan as proposed.

(ii) *Release of Breach of Contract Claims.*

■ The Beal/Icahn parties complain not only that the alleged breach by the AHC members causes their plan to be unconfirmable because it violates section 510(a) of the Bankruptcy Code, but they also complain that section 5.2 of the AHC/Debtor Plan seeks to release, on a nonconsensual basis, all of the First Lien Lenders' rights under the Intercreditor Agreement, including the claims the First Lien Lenders have asserted against the AHC members in the law suit pending before the District Court in the Southern District of New York.[31] The objectors cor-

---

**31.** Section 5.2 provides in relevant part:

Notwithstanding anything contained herein to the contrary, all Plan distributions made to creditors holding Allowed Claims in any Class take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bank-

ruptcy Code or otherwise, and are intended to be and shall be final, and no Plan distribution to the holder of a Claim in one Class shall be subject to being shared with or reallocated to the holders of any Claim in another Class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement or other similar intercreditor arrangement. As of the Effective Date, any and all contractual, legal and equitable subordination

rectly reflect that the non-consensual release of claims against the AHC members is not permissible under Third Circuit law.

■ As reflected above, at a minimum, a plan proponent who seeks a non-debtor third party release in the Third Circuit must show fairness, necessity to the debtor's reorganization, and consideration for the release. Even if the fairness of the proposal and the consideration to be offered are demonstrated, the necessity for the release is called into question by the circumstances of this case. While the cash infusion to be provided by the AHC members is necessary for the AHC/Debtor Plan, it is not necessary for the reorganization of the debtors, because an alternative to reorganize the debtors, i.e., the Beal/Icahn Plan, exists. The release of liability in connection with any violations of the Intercreditor Agreement is not sustainable on this record.

### c. Indemnification of the Backstop Parties.

■ The United States Trustee ("UST") objects to § 5.4(n) of the AHC/Debtor Plan. In § 5.4(n) the Reorganized Debtors agree to indemnify and hold harmless the Backstop Parties against any and all losses and claims arising out of or in connection with the Rights Offering, the Backstop Agreement, the Plan or any transactions contemplated thereby. In response to the UST's concern, the proponents of the AHC/Debtor Plan have deleted "the Plan" from this section, leaving for indemnification any claim arising out of or in connection with "the Rights Offering,

the Backstop Agreement, or the transactions contemplated hereby or thereby or in connection therewith." The debtors and the AHC believe that the adjustment adequately addresses the United States Trustee's concern in this regard. I agree, with the caveat and clarification that the proposed indemnification would encompass the types of transactions described, including "distribution of the Backstop Stock and the payment of the Backstop Fees and expenses, if any, distribution of the Subscription Rights, the purchase and sale of New Common Stock in the Rights Offering, and purchase and sale of unsubscribed shares pursuant to the Backstop Agreement." Indemnification would not include, for instance, any liability the AHC members might have to the First Lien Lenders if it were found that the Intercreditor Agreement between them had been breached.

### B. Section 1129(a)(3).

■ Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The burden to establish good faith is on the plan proponent. *In re PPI Enterprises, Inc.*, 324 F.3d 197, 211 (3d Cir.2003). The totality of the circumstances must be considered in the course of a "fact-intensive, case-by-case inquiry." 324 F.3d at 211. " '[T]he important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.' " *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d

---

rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments hereunder are settled, compromised, terminated and released pursuant hereto; pro-

vided, however, that nothing contained herein shall preclude any person or entity from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan.

Cir.2000) (quoting *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 n. 5 (3d Cir.1986)). *See also In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir.1999) (case that lacks valid reorganizational purpose should be dismissed); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147, 163 (D.N.J.2005) (following *Combustion Engineering*); *In re Lernout & Hauspie Speech Products N.V.*, 308 B.R. 672, 675 (D.Del.2004) (Good faith has been described alternatively as requiring that: "(1) the plan be consistent with the objectives of the Bankruptcy Code; (2) the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; or (3) there was fundamental fairness in dealing with the creditors") (footnotes omitted).

The Icahn parties contend that the AHC and the debtors have failed to demonstrate that their plan has been proposed in good faith, offering several bases for their contention. The objectors charge the officers and directors of the debtor with a breach of their fiduciary duties by: (1) failing to evaluate the fairness of the DJT Settlement Agreement with the AHC before binding the debtors to the plan,[32] (2) contractually binding the debtors to the AHC/Debtor Plan, through the Noteholders Backstop Agreement, thereby jeopardizing the debtors' ability to continue to use cash collateral, preventing the debtors from accessing necessary financing, and forcing the debtors to "slash critical capital expenditures in order to compensate for the liquidity strain under that plan." Obj. to Confirm. of AHC/Debtors' Sixth Plan, Dkt. # 1238 at 73,[33] and (3) ceding their fiduciary duties to the AHC.[34] As well, the objectors contend that the debtors and the AHC have pursued a bad faith litigation strategy, filing amendments to the New Term Loan and to the Plan even after testimony at the confirmation hearing has been concluded, and filing a motion to approve an AHC DIP financing facility during the confirmation hearing, which was amended shortly before the deadline for the submission of the First Lien Lenders' objection. According to the Icahn Parties, these actions demonstrate "unabashed gamesmanship" which should defeat the AHC/Debtor Plan.

 The focus of the good faith requirement is on the plan itself, and whether the plan achieves a reorganization objective that is consistent with the Bankruptcy Code. Nevertheless, a demon-

---

**32.** Relying partially on an SEC filing in March 2009, the objectors hypothesize that the officers and directors of the debtors conspired with Donald Trump, from as early as March 2009, to carry out "Mr. Trump's goals to capture for himself the worldwide right—now held by the Debtors—to license his name to other gaming enterprises." Obj. to Confirm. of AHC/Debtors' Sixth Plan at 43.

**33.** For instance, the Final Cash Collateral Order entered March 23, 2009 provides that the debtors' use of cash collateral shall be terminated if "any Debtor files a proposed plan of reorganization in the Chapter 11 cases which does not provide for the payment in full in cash of the Prepetition First Lien Obligations." ¶ 3(b)(ii).

**34.** The objectors cite to testimony by Mark Juliano, the debtors' Chief Executive Officer, and Edward D'Alelio, a member of the debtors' Board of Directors, during the confirmation hearing, neither of whom could recite details about proposed DIP financing to be provided by the AHC. This was in contrast to the testimony of Mark Lasry of Avenue Capital, a member of the Ad Hoc Committee who recited specific terms of the DIP financing proposal during his testimony. As well, Mr. Juliano testified that he was aware that AHC had been negotiating with the Coastal parties regarding the sale of the Trump Marina and the settlement of the Florida litigation, with no specific authority from the debtors to do so.

stration of a breach of fiduciary duty by officers or directors of a debtor may certainly defeat the confirmability of the debtors' plan on lack of good faith grounds. For instance, in *In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D.Del.2001), the debtor's plan of reorganization was rejected on good faith grounds where the debtor's chief executive officer and president had been receiving almost $1 million per year under a separate employment agreement with one of the debtor's largest creditors, without the debtor's knowledge. This arrangement tainted the debtor's entire reorganization effort, and prevented the court from confirming the plan.

■ No such demonstration of breach of fiduciary duty is presented here. The actions of the debtors and their respective officers and directors must be understood in the context of the sequence and timing of events in this case. At the time that the decision was made by the Board to support the AHC plan and the DJT Settlement Agreement in early December 2009, there was substantial prospect of a consensual arrangement with the First Lien Lender at the time, Beal Bank. Several witnesses testified that discussions with Beal were on the "one yard line." According to Mr. Juliano and others, the Board, expecting the treatment of the First Lien Lender to resolve, reached its decision to support the AHC plan and the DJT Settlement Agreement because the plan offered a substantial capital infusion, and also afforded an opportunity for unsecured creditors (including Second Lien Noteholders) to invest in the Reorganized Debtors. Consultation with the debtors' financial advisor, Lazard and Company, confirmed to the Board that the plan as proposed by the Ad Hoc Committee was feasible. The restrictions of the Final Cash Collateral Order did not appear to be impediments, because the

First Lien Lender had not asserted any violations as of that time, and the prospect of a consensual plan seemed likely. After the Icahn partners acquired a portion of the First Lien Lender claim and joined the Beal Bank plan, the Board determined that the Beal/Icahn plan did not offer as broad a distribution to creditors, did not offer an operating plan, and did not explain how the Trump casinos would coexist with the Tropicana and the Fountainbleau, other casino holdings of the Icahn parties. Following the Board's decision to support the AHC plan, the debtors' officers and directors relied heavily on their attorneys and other professional advisors, and worked closely with the plan's co-proponent, the AHC, to further the progress of the plan.

As to the objectors' hypothesis that the debtors conspired with Trump to permit him to expand the opportunity to license his name to other gaming enterprises worldwide, the theory does not hold up under scrutiny. Notably, the objectors failed to question either Robert Pickus, the debtors' general counsel, Mr. Trump, Mr. Juliano, the debtors' CEO, or Edward D'Alelio, a member of the debtors' Board of Directors, about the SEC filing upon which the theory is premised. The objectors' theory in this regard is purely speculative.

The objectors are correct to express concern about the agreement by the debtors' Board, contained in the Noteholders Backstop Agreement, to bind and commit the debtors to the AHC/Debtor Plan. While all restrictions on a debtor's ability to market its assets are not per se illegal, it has been held that "any such clauses must be subject to the strictest scrutiny by a Bankruptcy Court." *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 738 (Bankr. W.D.Ky.), *aff'd*, 233 B.R. 739 (W.D.Ky. 1998). I have afforded such scrutiny to

the facts presented, and conclude that the actions of the officers and directors of the debtors, and the manner in which the case has proceeded [35] do not constitute the sort of breach of fiduciary duty that would defeat the confirmation of the AHC/Debtor Plan.[36]

The focus of the good faith requirement is whether the plan under consideration advances the reorganization objectives of Chapter 11 of the Bankruptcy Code, in a manner that can be effected and is otherwise supportable. The AHC/Debtor Plan proposes to reduce the debt carried by the debtors by upwards of $1.4 billion, infuses the debtor with $225 million, and offers some otherwise "out of the money" creditors the chance to benefit from the potentially successful reorganization of the debtors. On this record, I conclude that the AHC/Debtor Plan is in conformance with Chapter 11 reorganization goals, is proposed in good faith and not by any means forbidden by law.

## C. Section 1129(a)(4).

 Section 1129(a)(4) requires that:

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). Under its clear terms, "any payment" made or to be made by the plan proponent or the debtor for services "in or in connection with" the plan or the case must be approved by or "subject to the approval of" the bankruptcy court as "reasonable." *See In re Congoleum Corp.*, 414 B.R. 44, 59 (D.N.J.2009) (pre-petition settlement payments and facilitation fees were subject to court review); *In re Idearc Inc.*, 423 B.R. 138, 163–64 (Bankr.N.D.Tex.2009) ("Section 1129(a)(4) of the Bankruptcy Code has been construed to require that all payments of professional fees made from estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness."); *In re Sentinel Management Group, Inc.*, 398 B.R. 281, 316 (Bankr.N.D.Ill.2008) ("Section 1129(a)(4) requires that the court exercise substantive control over fees and costs related to confirmation and the Chapter 11 case."). " 'Section 1129(a)(4) is designed to insure compliance with the policies of the Code that (1) the bankruptcy court should police

---

**35.** The "gamesmanship" by the plan proponents that the objectors complain about, focusing on filings to amend the New Term Loan proposed under the plan and to provide DIP financing to the debtors upon confirmation, actually served not to detract from the Beal/Icahn plan, but to meet the objections to the AHC/Debtor Plan (i.e., that the new Term Loan failed to contain market covenants, and that the debtors' liquidity between confirmation and the Effective Date of the plan was questionable) and to improve upon the plan.

**36.** Other cases cited by the objectors are inapposite here. In *In re Tenney Village Co.*, 104 B.R. 562 (Bankr.D.N.H.1989), a Chapter 11 financing agreement between the debtor and its primary lender was disapproved on the ground that the terms were overreaching, and would unduly prejudice other lenders and junior creditors in the case. The case did not implicate the section 1129 requirement of good faith. And in *In re The Cara Corp.*, No. 90–15379S, 1992 WL 88189 (Bankr.E.D.Pa. Apr.27, 1992), a plan of reorganization proposed by an official unsecured creditors committee was rejected where the unsecured creditors voted against the plan. The court determined that the committee's decision to "press on" in the face of the negative pronouncement from its constituency constituted bad faith, particularly where the plan clearly benefitted the committee's counsel, but may not have benefitted the creditor body itself.

the awarding of fees in title 11 cases and (2) holders of claims and interests should have the benefit of such information as might affect the claimants' decision to accept or reject the plan.'" *In re Journal Register Co.,* 407 B.R. 520, 537 (Bankr. S.D.N.Y.2009) (quoting *In re Future Energy Corp.,* 83 B.R. 470, 488 (Bankr.S.D.Ohio 1988)). "While a strong argument might be made that payments that are not made to fiduciaries and that do not deplete the bankruptcy estate need not be subject to court approval, this is simply not the decision that Congress has chosen to make." *In re Cajun Electric Power Coop., Inc.,* 150 F.3d 503, 514 (5th Cir.1998), *cert. denied,* 526 U.S. 1144, 119 S.Ct. 2019, 143 L.Ed.2d 1031 (1999). By its terms, section 1129(a)(4) does not require pre-payment approval by the court, but it does subject such payment to disgorgement in the event that the court finds the payment not to be reasonable.

■ The UST objects to the provisions of the AHC/Debtor Plan which require the reorganization debtors to pay the Ad Hoc Committee's advisors, including counsel and financial advisors, the Second Lien Indenture Trustee's fees and expenses, and the Backstop Parties' fees and expenses, all without application by or on behalf of any such parties, without notice and a hearing, and without court approval. *See* §§ 2.2, 9.1(e) and 12.2 of the AHC/Debtor Plan. In their Joint Post–Confirmation Memorandum, the Ad Hoc Committee and the debtors reflect that the accrued professional fees for the AHC advisors and the Backstop fees and expenses amount to approximately $10.9 million. There is no estimation of the fees and expenses to be sought by the Indenture Trustee. The UST also contends that the

proponents of the AHC/Debtor Plan have failed to establish legal authority for bypassing the requirements of section 503(b) in providing for the payment of fees and expenses to the non-debtor entities proposed to receive such payments.

The provisions of the plan that contemplate the payment of fees to the Ad Hoc Committee, the Backstop Parties, and the Indenture Trustee are violative of the provisions of section 1129(a)(4). Court approval of the fees is required to determine that each of the entities' fees and expenses to be paid by the debtors are authorized to be paid under the Code, and are reasonable.

1. *Authorization for Payment of Fees.*

■ Sections 503(b)(3) and (4) authorize the court, after notice and a hearing, to allow as administrative expenses reasonable compensation for professional services rendered by attorneys or accountants for "a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title" for making "a substantial contribution" to a Chapter 11 case. 11 U.S.C. § 503(b)(3)(D) and (4). Section 503(b)(5) authorizes payment of reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case. 11 U.S.C. § 503(b)(5). Section 1129(a)(4) makes no reference to § 503(b). However, § 1129(a)(1) mandates compliance with the applicable provisions of Title 11. The question is whether § 503(b) controls here, requiring a showing of substantial contribution by the prospective payees, or whether the payments can be made on some other grounds, as the proponents suggest.[37]

---

**37.** The proponents of the AHC/Debtor Plan do not cite to any other Code authority for the payments, but contend that "it is common

practice in large and complex chapter 11 cases, such as these, for the Debtors' estates to be responsible for the fees and expenses of

In the context of determining whether a breakup fee to an unsuccessful bidder at a bankruptcy auction could be sustained, the Third Circuit has stated that courts may not "create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code." *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 532 (3d Cir.1999). In considering whether any provision of the Bankruptcy Code authorizes such a payment, the court found the "most likely source of authority" to be 11 U.S.C. § 503. In focusing on § 503(b), the *O'Brien* court rejected § 363(b), and its accompanying business judgment test, as a basis for approving the right to recover from the bankruptcy estate for a breakup fee.[38] While authorization for payment of professional expenses during a Chapter 11 case has been granted elsewhere in unique circumstances, *see, e.g., In re Bethlehem Steel Corp.*, No. 02 CIV. 2854, 2003 WL 21738964 (S.D.N.Y. July 28, 2003), the *O'Brien* decision suggests strongly that § 503(b) is the only source for approval of the payment of fees such as the fees proposed to be paid to the AHC, the Backstop Parties and the Indenture Trustee.

The AHC, the Backstop Parties, and the Indenture Trustee must apply under § 503(b) for payment of their fees and expenses.

### 2. *Reasonableness.*

What is meant by "reasonable" is not defined in section 1129(a)(4). While section 330 also uses the "reasonable" standard, we know of no court that has applied the standards and rules developed under section 330 to the interpretation of section 1129(a)(4). 7 Lawrence P. King, Collier on Bankruptcy, ¶ 1129.02[4] at 1129–30 (16th Ed.2009). The Ad Hoc Committee has offered to present copies of its invoices to the court for *in camera* review to satisfy the (a)(4) requirement. That offer is accepted, with the caveat that the invoices must be shared under appropriate confidentiality provisions with the United State Trustee, and counsel for the debtors, the Icahn parties and Beal Bank. The Backstop Parties must also comply in the same way, by providing invoices reflecting fees and expenses to the court, with copies to the named entities, to enable the court to determine the reasonableness of the charges. As to the Indenture Trustee, because § 503(b)(5) specifies that reasonable compensation for services rendered by an indenture trustee must be "based on the time, the nature, the extent and the value of such services, and the cost of comparable services other than in a case under this title," an appropriate application from the Indenture Trustee is required.

### 3. *Backstop Stock.*

As to the Backstop Stock fee of 20% of the equity of the Reorganized Debtors, no further application or documentation is required.

The UST likens the awarding of the Backstop Stock fee to a breakup fee, which must be treated as an administrative expense claim under 11 U.S.C. § 503(b)(1)(A). *In re O'Brien Environ-*

---

the plan sponsor, but for whose equity commitment the Debtors could not reorganize." Joint Post–Conf. Hearing Memo at 59.

**38.** In a more recent expression about breakup fees by the Third Circuit, the court explained that its comment in *O'Brien* about the applicability of the business judgment rule in a bankruptcy case did not obviate the role of the business judgment rule in the § 363(b) context, but "was limited to the circumstance of a party seeking an alternative to § 503(b) as a basis for awarding the expenses from the bankruptcy estate." *In re Reliant Energy Channelview, LP*, 594 F.3d 200, 209 n. 13 (3d Cir.2010).

*mental Energy, Inc.*, 181 F.3d at 536. If the AHC/Debtor Plan is confirmed and goes effective, the only circumstance under which the Backstop Stock would be awarded, the Backstop Stock could readily be characterized as "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Here, the awarding of stock is more akin to an underwriting fee for agreeing to provide funding for the reorganization of the debtors, regardless of the outcome of the Rights Offering to all qualified creditors in the case. In fact, other than the Backstop Parties, the only exercise of Subscription Rights by other qualified investors was in the approximate amount of $27,000. The remainder of the $225 million of equity is coming from the Backstop Parties. Whether the award of Backstop Stock is characterized as an actual and necessary administrative expense, or whether the Backstop Parties are deemed to have made a substantial contribution to the case, the award of Backstop Stock may be sustained without further application.

### D. *Section 1129(a)(11).*

 Section 1129(a)(11) codifies the feasibility requirement and requires a demonstration by the proponent of the plan that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 "plan 'has a reasonable probability of success,' and is more than a 'visionary scheme[ ].' " *In re Wiersma*, 227 Fed.Appx. 603, 606 (9th Cir.2007) (quoting *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir.1986) and *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985)). *See also In re T–H New Orleans L.P.*, 116 F.3d 790, 801 (5th Cir.1997) ("The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence."); *In re Surfango, Inc.*, No. 09–30972, 2009 WL 5184221, *11 (Bankr.D.N.J. Dec.18, 2009) (preponderance standard). In other words, "as a practical matter it requires the court to find that the plan is 'workable' before it may be confirmed." *In re Danny Thomas Properties II L.P.*, 241 F.3d 959, 962 (8th Cir.2001). This determination is necessarily case-by-case and requires a " 'relatively low threshold of proof.' " *In re DBSD North America, Inc.*, 419 B.R. 179, 202 (Bankr.S.D.N.Y.2009), *aff'd,* 2010 WL 1223109 (S.D.N.Y. Mar.24, 2010). *See also In re G–1 Holdings Inc.*, 420 B.R. 216, 267 (D.N.J.2009) (the "key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed"); *In re Griswold Bldg., LLC,* 420 B.R. 666, 697 (Bankr.E.D.Mich. 2009) (ultimately, the plan must be "doable"). That is not to say that the proponents must "guarantee" their financial future. It simply means that the " 'mere potential for failure of the plan is insufficient to disprove feasibility.' " *Wiersma,* 227 Fed.Appx. at 606 (quoting *In re Patrician St. Joseph Partners L.P.,* 169 B.R. 669, 674 (D.Ariz.1994)). It is enough for the proponents to provide " 'a reasonable assurance of commercial viability.' " *T–H New Orleans L.P.*, 116 F.3d at 801 (quoting *In re Briscoe Enter., Ltd., II,* 994 F.2d 1160, 1166 (5th Cir.1993)). *See also In re South Canaan Cellular Investments, Inc.*, 2010 WL 1257747 at *12.

 The key components of the feasibility assessment of the AHC/Debtor Plan are the ability of the Reorganized Debtors to service the debt, whether the proposed

New Term Loan exceeds the Reorganized Debtors' debt capacity, and the prospect of obtaining the necessary regulatory approvals.

### 1. *Servicing the New Term Loan.*

#### a. *Debtors' Projected EBITDA.*

The starting point for assessing the ability of the Reorganized Debtors to service the New Term Loan is the debtors' projected EBITDA [39] for 2010 through 2013. At the end of December 2009, as is customarily done, the debtors' management revised budgeted EBITDA for 2009 and 2010, but did not revise projections for 2011 through 2013, except for minor corporate expenses. The following chart reflects the adjustments made, with reorganization expenses included (in millions):

| | Prior to Adjustment | Adjustment as of January 5, 2010 |
|------|---------------------|----------------------------------|
| 2009 | $68,292 | $56,527 |
| 2010 | $86,674 | $64,118 |
| 2011 | $96,460 | $94,388 |
| 2012 | $77,709 | $75,605 |
| 2013 | $94,777 | $92,641 |

The primary EBITDA adjustment made by the debtors was the reduction of capital expenditures ("capex") from the EBITDA projections in 2009 of $8.3 million ($35.1 million to $26.8 million) and a reduction of $44.3 million in 2010 ($54.3 million to $10 million). The Beal/Icahn parties challenge the debtors' projections on several grounds, including the failure to adjust future earnings projections to account for the capex spending reductions, the failure of the projections to adequately consider competitive forces, particularly the introduction of table games in Pennsylvania, the unsubstantiated jump in EBITDA projected from 2010 to 2011, and the negative historical performance of the debtors over the last ten years.

##### (i) *Capex Spending Reduction.*

Historically, the debtors have targeted a 20% return on investment in individual capital projects. The reduction in capex for 2009 and 2010 to arrive at the adjusted EBITDA numbers contemplates a reduction in both maintenance capex and project capex. Certain anticipated projects, including the improvement of the spa and pool areas and the relocation of an upscale steak restaurant at the Taj Mahal, have been deferred.

The debtors offered several plausible reasons to justify the fact that they made no adjustments to future projections on the basis of the capex reductions. First, because of the drop in consumer spending caused by the economic slowdown, the normally expected 20% return on investment could not be achieved. Second, during the last four years, the debtors have outspent their Atlantic City competitors in capex by almost $400 million, building a new tower of hotel rooms at the Taj, and adding amenities at each of the casinos. All of the debtors' immediate Atlantic City competitors have reduced substantially their capex expenditures in 2009.[40] Based on the large capex expenditures by the debtors in recent years, and the comparable rates of capex expenses by other Atlantic City casinos in 2009, the debtors do not expect that

---

**39.** EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) is defined as "[a] company's income without deductions for interest expenses, taxes, depreciation expenses, or amortization expenses, used as an indicator of a company's profitability and ability to service its debt." Black's Law Dictionary at 585 (9th Ed.2009).

**40.** Capex expenditures by all of the Atlantic City casinos for the last three years are noted as follows:

2007—$963 million
2008—$626 million
2009—$ 85 million (on an annualized basis as of September 2009).

the reduction of capex in 2010 will impact on their Atlantic City market share going forward.

Testifying on behalf of the Beal/Icahn parties in opposition to the AHC/Debtor Plan was Neil Augustine, Managing Director and Head of the North American Restructuring Group of Rothschild, Inc., an international provider of debt advisory and restructuring services. Mr. Augustine is highly qualified and experienced in advising financially troubled companies and their creditors, but has had little experience with gaming companies, and no previous exposure to the casino market in the Northeast Region, including Atlantic City. In opining on the lack of achievability of the debtors' projections, Mr. Augustine considered the historic 20% return expected by the debtors in a stable economic environment and the reductions in project capex made by the debtors in budgeted EBITDA for 2009 and 2010 to impose an across the board reduction of the debtors' budgeted EBITDA for 2011 through 2013 in the amount of $10.5 million each year.[41] This rather arbitrary and substantial reduction in EBITDA was largely discredited both during his cross-examination, and by the expert witnesses who testified on behalf of the AHC/Debtor Plan.[42] In his analysis, Mr. Augustine did not differentiate between project capex and maintenance capex, and did not know which capex was being deferred.[43] He also failed to factor into his opinion the general reduction in consumer discretionary spending occasioned by the current economic downturn, which curtails the achievement by gaming companies like the debtors of their historical expectation of a 20% rate of return on project capex. Nor did Mr. Augustine recognize in his analysis the dramatic decrease in capex by all of the other Atlantic City casinos over the last three years.

It is undeniable that, in the long-term, a reduction in capex spending may impact on EBITDA. However, a sufficient basis has been offered to establish that a deferral of some project capex in this market will not materially impact upon the debtors' projected EBITDA going forward.

(ii) *Competitive Forces, including Pennsylvania Table Games.*

Although the debtors incorporated in their projections consideration of various competitive forces, including the anticipated opening of the new Revel Casino in Atlantic City, the debtors did not make adjustments to EBITDA projections based on the passage of legislation in Pennsylvania, in January 2010, authorizing table gaming at Pennsylvania slot parlors and casinos. During Mr. Augustine's one-day meeting with the debtors' management in January 2010, in apparently casual response to Mr. Augustine's inquiry regarding the impact of Pennsylvania table gaming on the debtors' projected EBITDA, a member of the management team opined that the impact might be in the range of $7 million to $10 million. Following the meeting, upon Mr. Augustine's request, the debtors provided to Rothschild a mathematical calculation of the potential range of

---

41. He also reduced the 2010 EBITDA projection by $5.1 million for the 6 months commencing July 1, 2010.

42. The expert witnesses who testified about the debtors' projections included William H. Hardie, III of Houlihan Lokey Howard & Zukin, and Andrew Yearly of Lazard Freres & Co.

43. Mr. Augustine opined that if maintenance capex is not expended, there may be an expected degregation in future EBITDA. However, his assessment of a 20% degregation each year, from 2011 on, was not plausible.

reduction of EBITDA that might be occasioned by Pennsylvania table gaming, between 5% and 20%. The calculation was conveyed with the caveat that the chart was not intended to reflect management's projection of the impact of Pennsylvania table gaming. Notwithstanding the caveat, Mr. Augustine chose a so-called midpoint of the mathematical calculation to reduce the debtors' EBITDA projections for 2011, 2012 and 2013 by $10.2 million each year.

The deductions imposed by Mr. Augustine on the debtors' projections, which he based on the anticipated advent of Pennsylvania table games, were largely discredited.[44] Mr. Augustine acknowledged that he had no knowledge of the status of particular gaming ventures in Pennsylvania, that final regulations governing Pennsylvania table games had not yet been promulgated, and that various factors, including the lack of hotel rooms and other amenities connected to the Pennsylvania gaming establishments, might ameliorate the impact of Pennsylvania table games on the debtors' operations.

The debtors recognize that there will be some negative impact on their operations as Pennsylvania table gaming is established. However, no adjustments can be made at this point because such adjustments would be speculative, particularly in the absence of permanent regulations and fixed time frames for the commencement of Pennsylvania operations. During the confirmation hearings, the substantial delays in the various Pennsylvania projects were outlined. Delays in the Atlantic City projects, including the opening of the Revel Casino, and delays in other regional gaming facilities, including the Aqueduct project in New York, were also noted. Many of these projects had already been factored into the projections. Because both positive and negative developments in the competitive gambling environment were occurring, all of which are fluid and speculative, management's decision not to reopen the EBITDA projections for 2011, 2012 and 2013 on this ground should not be disturbed on the basis of the objectors' challenge.

(iii) *Historical Performance of the Debtors.*

The Beal/Icahn parties correctly reflect that the historical performance of a company is a significant predictor of the achievability of their projections going forward. The Beal/Icahn parties note that during the last ten years, the debtors have missed their EBITDA projections 9 out of 10 times. In that light, they question the opportunity of the debtors to achieve the projected EBITDA numbers for 2011 and on, particularly because the budgeted EBITDA of $94.4 million in 2011 represents a 47% increase over the EBITDA projection of $64.1 million for 2010.

The debtors support their projections by reflecting upon the fact that the 2011 through 2013 projections are well below the EBITDA numbers achieved in 2005 ($166.3 million), 2006 ($180.6 million) and 2007 ($144.4 million). The numbers projected for the three years, $96 million, $77 million and $94 million, respectively, represent a very conservative expectation of a gradual rebound in cash flow, signifying, at its high point in 2011, approximately 50% of the level reached by the debtors in 2006. The $19 million decline in EBITDA in 2012

**44.** The presentation by Mr. Augustine in his report of the debtors' mathematical calculations, noted as "Management's 'EBITDA's flowthrough scenarios'", without the caveats imposed upon those calculations by debtors' management, shed negative light on the methodology used by Mr. Augustine to arrive at his opinions regarding management's projections.

was forecast in anticipation of the opening of the Revel Casino next to the Taj Mahal in December 2011, an opening that is highly unlikely to occur.[45]

As to missed projections in earlier years, the current management team has been with the debtors since 2006. Since then, all of the casinos in Atlantic City have experienced serious setbacks.[46] Nevertheless, the debtors have managed to retain their market share in the Atlantic City market.

Also noted was the fact that in January and February 2010, the debtors missed their revised EBITDA projections due to the severe weather conditions experienced by the region on key weekends during that time. Debtors' management noted, however, that only approximately 4% of the annual budgeted EBITDA numbers is earned during January and February, and that the debtors were meeting projections on days when the weather was not a factor.

On this record, I am able to conclude that the projections advanced by the debtors, as revised in the January 5, 2010 Disclosure Statement, are reasonable and attainable.

### b. *Ability to Service the New Term Loan.*

Assuming that the Reorganized Debtors meet their projections for 2010 through 2013, and assuming further that the New Term Loan interest rate is determined to be 12%,[47] the AHC/Debtor Plan has been shown to be serviceable, with sufficient cash flow to meet the debtors' operational needs. William H. Hardy, III of Houlihan

Lokey Howard & Zukin ("Houlihan Lokey"), a well qualified financial consultant with significant experience with gaming companies, testified on behalf of the AHC/Debtor Plan. He produced analyses reflecting that the projected ending cash balances for 2010 through 2013, based on the debtors' projected EBITDA, would support the required principal and interest payments. As well, he performed sensitivity analyses upon the projections, which assume that the debtors will miss their EBITDA projections for 2011, 2012 and 2013 by 10% and 20% respectively. The only adjustment made by Mr. Hardy to the 20% miss analysis was the elimination of project capex, but not maintenance capex, during the years in questions. In his worst case analysis, he did not take into account the likely sale of the Trump Marina, with its expected elimination of negative cash flows, maintenance capex requirements and additional corporate expenses. Nor did he consider the prospect that if there were significant EBITDA reductions, a host of potential management responses to mitigate the impact of the reductions would be employed. Even in the worst case scenario of a 20% miss of EBITDA projections, Mr. Hardy concluded that the New Term Loan would be serviceable through to maturity, and that the Reorganized Debtors would be able to meet their operational needs.

In his cash flow analysis, Mr. Augustine predicts that the debtors will run out of cash before the maturity date of the New Term Loan in 2015. However, he uses an interest rate of 15.25% as the market interest rate on the New Term Loan, and

---

**45.** It appears that construction on the Revel Casino has ceased, and that approximately $1 billion of financing is needed to complete the project, which is not yet available.

**46.** In 2007, the smoking ban and increases in gas prices impacted revenues. More signifi-

cantly, in 2008 and 2009, the economic downturn had substantial negative impact on all of the Atlantic City casinos.

**47.** *See* pages 163–66, *infra.*

applies the reduced EBITDA numbers contained in his report, which were largely discredited, to calculate his projections. Mr. Augustine's predictions cannot be sustained on this record.

Another critical aspect of feasibility for the AHC/Debtor Plan is a demonstration that the New Term Loan, which will mature on December 31, 2015, may be refinanced at that time. Mr. Hardy testified that, assuming the debtors have the same EBITDA that they are projected to have in 2013, the company will be less leveraged, the $334 million loan will have been reduced by amortization to approximately $310 million to $320 million, and the EBITDA will be nearly $30 million higher than in 2010, all of which would contribute to the ability of the company to refinance the debt in 2015.

Serious and legitimate concern is raised by the Beal/Icahn parties as to the short term liquidity of the debtors. At a hearing held following confirmation hearings on various motions, Mr. Juliano, the debtors' Chief Executive Officer, testified that without debtor-in-possession financing, the debtors will run out of cash in May 2010. A group of investors from the Ad Hoc Committee have offered a $45 million DIP facility. The debtors' motion to approve the DIP facility is now scheduled to be heard on April 15, 2010, if the AHC/Debtor Plan is confirmed. Because the short term liquidity of the debtors would require a DIP facility to bridge the debtors' liquidity needs from confirmation to the effective date of the plan, confirmation of the AHC/Debtor Plan must be conditioned upon approval of the proposed DIP facility.

### 2. *Debt Capacity.*

Utilizing a total leverage approach and an interest coverage approach, Mr. Hardy from Houlihan Lokey concluded that the debt capacity for the post-reorganization debtors would be in the range of $305 million to $390 million. The funded debt level of $334 million proposed in the AHC/Debtor Plan is well within the midpoint of that range, and would be supportable by the Reorganized Debtors' financial structure.[48]

The Rothschild report disagrees with Houlihan Lokey's analysis, opining that the $334 million New Term Loan would leave the debtors dramatically overleveraged. Mr. Augustine's assessment that the Reorganized Debtors' debt capacity would be in the range of $158 million to $212 million was reached by using a high interest rate and a high debt base. The high debt base was premised upon a valuation of the debtors' Total Enterprise Value ("TEV") of $482.5 million.[49] As well, Mr. Augustine utilized more highly rated companies than the debtors as comparables for his debt capacity analysis, causing him to arrive at a debt capacity range that is

---

**48.** On the interest coverage approach analysis, the interest levels used were in the range of 10.5% to 11.5%. If the ranges for an interest rate at 12% were used, the new term loan of $334 million proposed by the AHC/Debtor Plan would not exceed the debtors' implied aggregate debt capacity based upon a combined analysis of the total leverage approach and the income coverage approach.

**49.** In the Disclosure Statement of the Beal/Icahn parties, reliance was placed on the valuation contained in the AHC/Debtor Plan of $459 million. During confirmation hearings, Mr. Augustine offered certain "Valuation Observations," aimed primarily at the value attributed to the Trump Marina. During summations, counsel for the Icahn parties confirmed that reliance was now being placed on a revision of the debtors' TEV, in the amount of $482.5 million, based on Mr. Augustine's observations. As noted below, in the context of determining the amount of the First Lien Lenders' allowed secured claim, I have determined that as of confirmation, the TEV of the debtors is $459 million.

significantly lower than the $334 million proposed to be incurred by the AHC/Debtor Plan. Mr. Augustine used different gaming company comparables for his debt capacity analysis than he did for his analysis regarding the appropriate market rate of interest for the New Term Loan, explaining that in determining debt capacity, he was not restricted to comparing only companies with high levels of debt, as proposed under the AHC plan. Rather, he could review the cash flows of a range of other gaming companies, some of whom presented far better financial profiles than the debtors. However, Mr. Augustine's choice of high performing companies with relatively low debt ratios to arrive at a relatively low debt capacity number for the debtors was suspect.

I readily conclude that the debt level of $334 million proposed in the AHC/Debtor Plan is within the debt capacity of the Reorganized Debtor.

### 3. *Compliance with Regulatory Framework.*

To establish the feasibility of their plan, in addition to demonstrating that the projected cash flow of the Reorganized Debtors will be sufficient to meet debt service and operational needs, and that the New Term Loan is within the Reorganized Debtors' debt capacity, the proponents of the AHC/Debtor Plan must also show that the new owners of the Reorganized Debtors will not face material hurdles to achieve the necessary regulatory approvals from the New Jersey Casino Control Commission ("CCC"). The Beal/Icahn parties argue that there is substantial uncertainty about whether the AHC members will obtain licensure, or waiver of licensure or qualification requirements, from the Casino Control Commission.

Under the New Jersey Casino Control Act, N.J.S.A. § 5:12–1 *et seq.*, persons holding 5% or more of the voting equity securities of a holding company (as defined in the Act) are presumed to have the ability to control the company, or to elect one or more directors, and will be required to obtain qualification from the CCC, unless the presumption is rebutted, or unless the qualification requirement is otherwise waived. N.J.S.A. § 5:12–105(d). Holders of publicly traded securities of a casino licensee, entity qualifier, subsidiary or holding company, may also be required to qualify as financial sources. Institutional investors who are holders of publicly traded securities may receive a waiver from the CCC from financial source or other qualification, if they purchased their holding for investment purposes only, and exercise no control over the affairs of the issuer. N.J.S.A. § 5:12–85. An institutional investor holding under 10% of the equity securities of a casino licensee's holding or intermediate companies "shall be granted a waiver of qualification if such securities are those of a publicly traded corporation and its holdings of such securities were purchased for investment purposes only and upon request by the commission it files with the commission a certified statement to the effect that it has no intention of influencing or affecting the affairs of the issuer, the casino licensee or its holding or intermediary companies." N.J.S.A. § 5:12–85(f). A waiver of qualification may be granted to an institutional investor holding a higher percentage of such securities, between 10% and 15%, "upon a showing of good cause and if the conditions specified above are met." *Id.*

Here, all but three of the members of the Ad Hoc Committee will have holdings of less than 10% of the equity securities of the Reorganized Debtors, and will apply for a waiver of qualification as institutional investors. Two other members of the Ad Hoc Committee, Contrarian and Polygon,

who will hold positions of 13.5% and 14.4%, respectively, will seek waiver "for good cause".

Testifying on behalf of the AHC, Gary Ehrlich, the former deputy director of New Jersey Division of Gaming and Enforcement ("DGE") reflected that the CCC has historically been permissive in granting institutional investor waivers from financial source qualification. In fact, Mr. Ehrlich noted he was not aware that the CCC has ever denied a request for such a waiver for any institutional investor that held less than 15% ownership in a casino. He opined that all of the AHC members who would hold less than 15% ownership in the Reorganized Entity would qualify as "institutional investors" within the statutory definition, and would likely receive waivers. In Mr. Ehrlich's opinion, the fact that AHC members may appoint a director to the Board of the Reorganized Debtors will not affect their quest for an institutional waiver, because the authority to appoint a director is different than the opportunity to exert continuing control over the licensee.

As to Avenue Capital, who will hold 21% of the Reorganized Entity, Mr. Ehrlich opined that the amended petition filed by Avenue, seeking a waiver of financial source qualification for some of its investors, and establishing a corporate structure that contemplates a separation of interests between voting members without control and non-voting members with control, is likely to be approved by the CCC. But if the Avenue petition is not granted, Avenue has agreed to subject all of its investors to financial source qualification, which simply means providing contact information about each of them to enable the DGE to conduct a passive investigation, or record search, of the entities. Mr. Ehrlich described the financial source qualification

process as "not onerous at all," and could take place in "a matter of days."

Mr. James Hurley, a former Commissioner and Chair of the New Jersey Casino Control Commission, who testified on behalf of the Icahn Parties, opined that the CCC would be unlikely to grant institutional investor waiver to all of the AHC members who would own less than 15% of the Reorganized Entity and would be unlikely to grant Avenue's amended petition for waiver of financial source qualification, because inadequate documentation had been provided. As to the availability of an institutional investor waiver, Mr. Hurley expressed concern about the opportunity of certain AHC members to appoint a director to the Board, opining that the authority to appoint a director may be viewed as "influencing or affecting the affairs of the issuer," N.J.S.A. § 5:12–85(f), which would preclude a waiver.

On this record, I conclude that there·is a reasonable prospect of success for the AHC members to obtain regulatory approval. Mr. Ehrlich, who has 28 years of experience with the DGE, testified convincingly that all but one of the AHC members, each of whom would own less than 15% of the Reorganized Equity, would likely be granted institutional investor waivers by the CCC. The fact that Mr. Ehrlich was not aware of any denial of such requests, even where good cause is required for ownership in the range of 10% to 15%, was convincing. Mr. Hurley's opinion that such waivers would not be granted was premised upon the notion that the applicants had not provided sufficient information or documentation to support the waiver request. However, all that is required is the submission of a form certification. Only later in his testimony was the issue of the authority of the AHC members to appoint a member of the Board of Directors raised. While Mr.

Ehrlich proposed that the appointment authority would not be dispositive of the waiver issue, a legitimate issue is raised regarding the "influence" or "affect" on the affairs of the Reorganized Debtor that the appointment of a member of the Board by AHC members would have. Nevertheless, even if institutional investor waivers are not granted, qualification otherwise for the AHC members is not unlikely. As to Avenue Capital, because it has agreed to subject all of its investors to financial source qualification if its amended petition to waive such qualification is denied, I can readily conclude that the likely outcome of the process will be approval of Avenue and its investors for financial source qualification.

In addition to financial source qualification, where any property relating to an ongoing casino operation is transferred, including a security holding in a casino licensee, holding company or intermediary, under circumstances that require licensure or qualification, the acquirer must seek "interim casino authorization" ("ICA"). N.J.S.A. § 5:12–95.12 through 95.16. Upon the filing of an application for ICA, the CCC must hold a hearing on the application and render a decision not later than 120 days after the filing. Avenue Capital will be applying for the ICA, and there is no basis in this record to believe that the ICA would be rejected.

I conclude that there is reasonable prospect that regulatory approvals for the proponents will be obtained.

### 4. *General Feasibility Considerations.*

To underscore the feasibility of the AHC/Debtor Plan, the proponents persuasively focus upon the willingness of the Ad Hoc Committee, a group of highly sophisticated investors, to invest $225 million in the debtors' enterprise. The investors appear to know the business and industry, have had frequent interaction with the debtors management, and believe in the achievability of the projections advanced by the management team. The debtors citation to Judge Peck's decision in the case of *In re Iridium Operating, LLC,* 373 B.R. 283, 348 (Bankr.S.D.N.Y.2007) is apt.

> Courts further recognize that "[a] powerful indication of contemporary, informed opinion as to value" comes from private investors who "[w]ith their finances and time at stake, and with access to substantial professional expertise, ... concluded at the time ... that the business was indeed one that could be profitably pursued." *In re Longview Aluminum,* 2005 WL 3021173, at *7; *see also Davidoff v. Farina,* No. 04 Civ. 7617, 2005 WL 2030501, at *10, *11, n. 19 (S.D.N.Y. Aug. 22, 2005) (finding it important that "sophisticated investors with the most intimate knowledge of [the debtor's] business plan and capitalization had confidence in the company's future and certainly did not think that the company was 'undercapitalized'" since it makes "no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail."); *Metlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d at 835 ("The price at which people actually buy and sell, putting their money where their mouths are, is apt to be more accurate than the conclusions of any one analyst.").

*Id.*

### E. *Section 1129(b).*

Confirmation of a consensual plan requires the proponent to satisfy each of the subsections of section 1129(a). If the plan satisfies all of the section 1129(a) elements except for section 1129(a)(8), which requires each impaired class of creditors to accept the plan, the plan proponent may seek confirmation notwithstanding the ob-

jection of a dissenting class by utilizing § 1129(b) to "cramdown" the claim. *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 441, 119 S.Ct. 1411, 1415, 143 L.Ed.2d 607 (1999); *In re Philadelphia Newspapers, LLC*, No. 09–4266, 2010 WL 1006647, *4 (3d Cir. Mar.22, 2010) ("Section 1129(b) provides circumstances under which a reorganization plan can be confirmed over the objection of secured creditors-a process referred to as a 'cramdown' because the secured claims are reduced to the present value of the collateral, while the remainder of the debt becomes unsecured, forcing the secured creditor to accept less than the full value of its claim and thereby allowing the plan to be 'crammed down the throats of objecting creditors.'"). Section 1129(b) provides an alternate path for confirmation "if the plan does not discriminate unfairly, and is fair and equitable" with respect to each impaired non-consenting class. 11 U.S.C. § 1129(b)(1). Here, Class 3 of the AHC/Debtor Plan, comprised of the First Lien Lenders, voted to reject the plan. The alternate path of cramdown pursued by the proponents must be reviewed.

### 1. *Unfair Discrimination.*

■ Section 1129(b) allows a plan to discriminate, so long as it "does not discriminate unfairly." Various standards have been developed by the courts to test whether a plan unfairly discriminates. Generally, a plan will not be found to have unfairly discriminated if:

(a) the discrimination is supported by a reasonable basis,

(b) the discrimination is necessary for reorganization,

(c) the discrimination is proposed in good faith, and

(d) the degree of the discrimination is directly related to the basis or rationale for the discrimination.

*In re Hawaiian Telcom Communications, Inc.*, No. 08–02005, 2009 WL 5386130, *31 (Bankr.D.Hawai'i Dec.30, 2009) (citing to *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 656 (9th Cir.1997), *cert. denied*, 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998)). *See also In re American Trailer and Storage, Inc.*, 419 B.R. 412, 443 (Bankr.W.D.Mo.2009); *In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 894–95 (Bankr.N.D.Ohio 2004); *In re Internet Navigator Inc.*, 289 B.R. 128, 132 (Bankr. N.D.Iowa 2003).

Other courts have articulated the test for determining whether a plan unfairly discriminates against a nonconsensual class by giving rise to a rebuttable presumption that a plan unfairly discriminates where there is:

(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*In re Armstrong World Industries, Inc.*, 348 B.R. 111, 121 (D.Del.2006) (quoting *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr.E.D.Mich.1999) (adopting the test proposed in Bruce A. Markell, "A New Perspective on Unfair Discrimination in Chapter 11", 72 Am.Bankr.L.J. 227 (1998))). *See also In re Lernout & Hauspie Speech Products, N.V.*, 301 B.R. 651, 661 (Bankr. D.Del.2003), *aff'd*, 308 B.R. 672 (D.Del. 2004); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228–29 (Bankr.D.N.J. 2000).

The Icahn parties contend that the AHC/Debtor Plan unfairly discriminates among holders of Second Lien Note claims in Class 4 by affording special treatment to a select group of such holders. The plan affords only certain Second Lien Noteholders the opportunity to serve as Backstop Parties to the Rights Offering, and thereby receive 20% of the New Common Stock. As such, the plan is not confirmable because it proposes disparate treatment of claim holders in the same class in violation of the equality of treatment requirement prescribed by section 1123(a)(4).

The objection of the Icahn parties in this regard does not relate to the proscription against unfair discrimination contained in section 1129(b). Class 4 of the AHC/Debtor Plan has accepted the plan. The concerns expressed by the Icahn parties in this regard relate to the classification issue of allegedly providing different treatment for each claim in Class 4. This classification issue was reviewed and resolved in the discussion on section 1129(a)(1), *supra.*

### 2. *Fair and Equitable.*

Unlike the concept of unfair discrimination, the Code at least partly defines the phrase "fair and equitable." Section 1129(b)(2) offers illustrative ways to satisfy the fair and equitable standard for classes of secured and unsecured creditors, as well as for a class of interests.

As to secured claims, the plan will be fair and equitable if it provides:

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A). "The three subsections of § 1129(b)(2)(A) each propose means of satisfying a lender's lien against assets of the bankruptcy estate." *In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 305 (3d Cir.2010).

Subsection (i) provides for the transfer of assets with the liens intact and deferred cash payments equal to the present value of the lender's secured interest in the collateral. Subsection (ii) provides for the sale of the collateral that secures a lender free and clear of liens so long as the lender has the opportunity to "credit bid" at the sale (i.e., offset its bid with the value of its secured interest in the collateral) with the liens to attach to the proceeds of the sale. Subsection (iii) provides for the realization of the claim by any means that provides the lender with the "indubitable equivalent" of its claim.

*Id.*

The AHC/Debtor Plan proposes to satisfy the First Lien Lenders' security interest in the debtors' assets by transferring ownership of the assets to the Ad Hoc Committee members with the liens intact, and providing deferred cash payments equal to the present value of the lender's

secured interest in the collateral. The issues presented include the retention of liens by the First Lien Lenders, the value of the lender's secured interest in the collateral, the present value of the claim, and whether the plan otherwise comports with the "fair and equitable" standard of § 1129(b).

### a. *Retention of Liens by the First Lien Lender.*

 The AHC/Debtor Plan provides that the New Term Loan shall be secured by substantially all of the assets of the debtors, consistent with the terms of the pre-petition security agreement. The First Lien Lenders contend that their security interest may be diluted in two ways, by the amendment of the Trademark License Agreement with Trump, and by the restrictions on the rights afforded to the First Lien Lenders regarding the contemplated sale of the Trump Marina.

The Amended and Restated Trademark License Agreement ("new TLA") is pledged to the First Lien Lenders in connection with the New Term Loan. The objectors complain that the package of trademarks licensed to the Reorganized Debtors by the Trump parties will shrink from 12 U.S. registered trademarks, 1 UK registered trademark and 7 common law trademarks to 6 U.S. registered trademarks [50] and no UK registered trademarks or common law trademarks. In addition, the trademark "Trump Casino" is no longer part of the package. In response, the proponents of the plan suggest that the rights of the Reorganized Debtors at the three casinos are substantially the same as they were pre-petition, and have been expanded in some respects. The exclusive, royalty-free license to use the Trump name now includes the right to use Ivanka Trump's image and likeness. The Trump

brand may not be used throughout New Jersey, New York, Connecticut, Pennsylvania, Maryland and Delaware, and Donald and Ivanka Trump have agreed to a new services agreement to participate in promotional, marketing and advertising activities.

As to the sale of the Trump Marina, the objectors complain that "the debtors retain the right to sell the Trump Marina at any price and on any terms". Beal/Icahn Obj. to Confirm. of the Modified Sixth Amended Joint Plan at 32. The proponents note that the First Lien Lenders retain their lien on the Marina, and that, assuming a sale of the Marina takes place outside of bankruptcy, the First Lien Lenders will have a right of first refusal and will receive 100% of the net sale proceeds.

 The AHC/Debtor Plan proponents rely on both § 1129(b)(2)(A)(i) and (iii) to support their treatment of the First Lien Lenders claims. As to (i), particularly with regard to the retention of liens, it has been noted that "[t]here is no requirement that the lender's prepetition security agreement or mortgage, with all its various terms and obligations, be used in order for the lender to retain its lien." 7 Lawrence P. King, Collier on Bankruptcy, ¶ 1129.04[2][a][iii] (16th Ed.2009). On the issue of the retention of liens, the Court of Appeals for the Fifth Circuit noted that "[w]e interpret the plan as ensuring [retention of a lien] if the debtor fails to comply with its debt service obligations, [the secured creditor] would have the right to foreclose." *In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1169 (5th Cir.), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993). As to (iii), the proponents' reliance on the "indubitable equivalent" option, the plan must: (1) protect the

---

**50.** The AHC/Debtor Plan proponents assert that the package includes 10 registered trademarks. Joint Post–Confirmation Hearing Memo, Ex. G.

creditor's principal, and (2) provide for the present value of the creditor's claim. *See, e.g., In re Sparks,* 171 B.R. 860, 866 (Bankr.N.D.Ill.1994). The Third Circuit recently explained in the *Philadelphia Newspapers* case:

> Though broad, the phrase "indubitable equivalent" is not unclear. Indubitable means "not open to question or doubt," Webster's Third New Int'l Dictionary 1154 (1971), while equivalent means one that is "equal in force or amount" or "equal in value," *id.* at 769. The Code fixes the relevant "value" as that of the collateral. *See* 11 U.S.C. § 1129(b)(2)(A)(iii) (requiring the "indubitable equivalent" of the secured claim); *id.* § 506(a) (defining a secured claim as "the extent of the value of such creditor's interest in the estate's interest in such property"). Thus the "indubitable equivalent" under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral.

*In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 310 (3d Cir.2010).

Under either formulation, the debtors have complied in this regard with the requirements of § 1129(b)(2)(A). The creditor's principal is protected by replacement liens on all of its assets, in favor of the First Lien Lenders, and by an equity cushion created by the reorganization process. The secured creditor can foreclose in the event that the debtors default in their obligations. As well, the plan provides for the present value of the First Lien Lenders' claim. The adjustments in the collateral retained by the First Lien Lenders are nominal and inconsequential. The requirement in § 1129(b)(2)(A)(i) that the secured creditor must retain its liens has been met.

### b. *Value of the Lender's Secured Interest in the Collateral.*

As noted, under 11 U.S.C. § 1129(b)(2)(A)(i)(II), a secured creditor must receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." Here, the contest between the Icahn parties and the AHC/Debtors on the issue of the value of the First Lien Lenders' collateral, i.e., the "Total Enterprise Value" ("TEV") of the debtors, is limited in scope, focusing exclusively on the value to be attributed to the Trump Marina, which is contemplated to be sold at some point following the confirmation of the AHC/Debtor Plan, and to the related Florida litigation, in which the debtors are plaintiffs.

The TEV valuation offered on behalf of the AHC/Debtors plan by Houlihan Lokey reflects a range of $400 million to $470 million for the Trump Taj Mahal and the Trump Plaza, and a $24 million valuation for the Trump Marina. The valuation of the Taj and the Plaza was conducted by using three methodologies, including the Market Multiple Approach, the Comparable Transaction Approach and the Discounted Cash Flow Approach, all of which produced a mid-point valuation of $434 million. Mr. Hardy adopted Lazard's valuation for the Trump Marina, at $24 million, based on the prospect that the Marina would be sold by December 2011, but factored in the lack of certainty regarding the sale, and the negative impact of the Marina on the debtors' operations going forward. The last written offer received by the debtors from a prospective purchaser, Coastal Industries, on July 28, 2009, was for $75 million, minus a $17 million deposit and other costs, with an anticipated net recovery of $48 million to the debtors.[51]

---

**51.** The original Asset Purchase Agreement to sell Trump Marina to Coastal Marina, LLC

Because neither the time frame nor the actual occurrence of the sale are certain, Lazard discounted the potential value of the Marina to the debtors by half, arriving at the $24 million valuation. When added to the mid-point valuation of $435 million for the Taj and Plaza, the TEV arrived at for the debtors' enterprise was $459 million. Mr. Hardy acknowledged that the $459 million valuation did not include the pending Florida litigation, the Trump brand, or any potential claims against the DJT Parties.

The First Lien Lenders do not challenge the Houlihan Lokey valuation of the Taj and the Plaza. However, although Mr. Augustine did not have time to complete a "full blown" valuation analysis,[52] he criticized the adjustment made to the value of the Trump Marina, opining that the value to be added to the TEV of the other two casinos to account for the value of the Marina should be $47 million. Therefore, according to Mr. Augustine, the debtors' TEV for § 1129(b) purposes should be $482 million.

Mr. Augustine supported his opinion, based partly on the assessment of value of the pending Florida litigation by Robert Pickus, General Counsel to the debtors, and Donald Trump, both of whom testified that the Florida litigation, which named Coastal as a defendant, is worth more than $50 million to the debtors. Mr. Augustine acknowledged, however, that he did not have personal knowledge about the litigation, and had not reviewed any documents

pertaining to the litigation. He also acknowledged that the $47 million attributed to the value of the Trump Marina should have been "discounted back" to present value, particularly in light of the fact that the sale of the Marina was uncertain, and that the Marina was generating a negative cash flow for the enterprise, increasing the debtors' incentive to sell.

On this record, I accept the opinion offered by Houlihan on behalf of the AHC/Debtor Plan, establishing a TEV of $459 million. The degree to which the value of the Marina should be discounted is a matter of discreet and expert judgment. The combined and extensive experience in the gaming industry of Mr. Yearly from Lazard and Mr. Hardy from Houlihan Lokey in arriving at the valuation of $24 million as the discounted value of the Trump Marina is more credible than the judgment of the Rothschild team, none of whom has had previous experience in valuing a gaming company. In arriving at its conclusions regarding the Marina valuation, Houlihan Lokey properly considered the fact that the Marina is losing money, causing the debtors to be incentivised to sell quickly. That Mr. Pickus and Mr. Trump have high hopes for the ultimate outcome of the Florida litigation is noted, but the outcome of that litigation is speculative, and the omission from the analysis of the debtors' TEV is justified. As well, in light of the uncertainty regarding the

executed on or about May 28, 2008 provided for a purchase price of $316 million. A $15 million deposit was escrowed. The Agreement was amended on October 28, 2008, reducing the purchase price to $270 million. An additional $2 million deposit was placed into escrow. On June 1, 2009, debtors terminated the agreement. On July 28, 2009, Coastal filed an adversary complaint against the debtors seeking the return of their deposit. The last proposal received from Coastal to

purchase the property was for $75 million, minus the $17 million deposit. The proposal required the dismissal of the Florida litigation being prosecuted by the debtors against Coastal and others.

**52.** Rothschild entered the case approximately six weeks prior to confirmation, and had only one day of meetings with debtors' managements.

debtors' right to continue to use the Trump brand, the omission of value in that regard is also justified. For purposes of section 1129(b)(2)(A)(ii), the value of the lenders' secured interest in the collateral is determined to be $459 million.

It should be noted here that because the First Lien Lenders have made the § 1111(b)(2) election, the AHC/Debtor Plan must provide that the sum of the payments to be received by the First Lien Lenders will be equal to the First Lien Lenders' total claim. The Bankruptcy Appellate Panel for the Ninth Circuit has explained the impact of the § 1111(b)(2) election on a cramdown under § 1129(b)(2) as follows:

> In order for a reorganization to now comply with the cram down requirements of § 1129(b)(2)(A)(i)(I), the electing creditor must retain a lien equal to the total amount of its claim. The lien is not stripped down by § 506(d). Subsection (II) of § 1129(b)(2)(A)(i) guarantees an electing creditor a stream of payments equal to its total claim. However, the stream of payments need only have a present value "of at least the value of such holder's interest in the estate's interest in such property," i.e., the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II). In other words, the present value of the electing creditor's stream of payments need only equal the present value of the collateral, which is the same amount that must be received by the nonelecting creditor, but the sum of the payments must be in an amount equal [to] at least the creditor's total claim.

*In re Weinstein*, 227 B.R. 284, 294 (9th Cir. BAP 1998) (citations omitted). *See*

*also In re Brice Road Developments, LLC*, 392 B.R. 274, 284–86 (6th Cir. BAP 2008).

Applying these principles here, in order for the plan to be confirmed, it must provide for the retention of the lien held by the First Lien Lenders on the debtors' collateral to the extent of the entire allowed amount of the lender's claim, which is estimated to be approximately $483 million, after applying a portion of adequate protection payments to the principal of the claim.[53] Deferred cash payments must be made to the First Lien Lender totaling at least the allowed amount of the total claim of $483 million. The First Lien Lenders, having made the § 1111(b)(2) election, receive a stream of payments equal to the total claim, thereby benefitting if there is an appreciation in the value of the collateral from a sale of the collateral or if the debtors default on the plan payments. However, the First Lien Lenders are entitled to interest payments only on the value of the collateral at the time of confirmation. *In re Weinstein*, 227 B.R. at 295, n. 13. The New Term Loan must be modified to include a section 1111(b) premium, which will provide the First Lien Lenders payments totaling the full amount of their claim, while paying interest only on the value of the New Term Loan at the value of the collateral at confirmation.

#### c. *Present Value.*

The requirement of section 1129(b)(2)(A)(i)(II) that the secured creditor must receive "value, as of the effective date of the plan" of at least the value of the lender's collateral means that if the plan provides for deferred cash payments, those payments must bear interest to account for the delay in the payment of the claim. *See Rake v. Wade*, 508 U.S. 464, 472 n. 8, 113 S.Ct. 2187, 2192 n. 8, 124

---

**53.** The ultimate allowed amount of the claim may be impacted by the motion for recharacterization of adequate protection payments presently pending and to be resolved upon the effective date of the debtors' plan.

L.Ed.2d 424 (1993) ("When a claim is paid off pursuant to a stream of future payments, a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments."); *In re Airadigm Communications, Inc.*, 547 F.3d 763, 769 (7th Cir.2008) ("Section 1129(b)(2)(A)(i)(II) thus requires interest if the claim is to be paid over time."). As well, the treatment of the secured creditor must be fair and equitable, meaning that the terms under which the deferred cash payments are made must not unduly shift the risk of failure to the secured creditor.

### (i) *Market Rate of Interest.*

■ A critical issue to be determined here is the appropriate rate of interest to be imposed upon the New Term Loan that would be issued to the First Lien Lenders. Section 1129(b) provides no guidance for calculating the cramdown interest rate required to be paid to confirm a plan of reorganization over a dissenting class of secured claims. *In re Griswold Building, LLC*, 420 B.R. 666, 692 (Bankr.E.D.Mich. 2009). In *Till v. SCS Credit Corporation*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), the Supreme Court determined, in a Chapter 13 case, that the appropriate interest rate to be paid to an objecting secured creditor is calculated in a formulaic way, by starting with the national prime rate and adjusting that rate by the risk of nonpayment posed by the new loan. In dictum, the Court noted that the determination of a cramdown interest rate is not necessarily the same in the Chapter 11 context. "[W]hen picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id.* at 477 n. 14, 124 S.Ct.

at 1960 n. 14. *See also In re American HomePatient, Inc.*, 420 F.3d 559, 568 (6th Cir.2005), *cert. denied,* 549 U.S. 942, 127 S.Ct. 55, 166 L.Ed.2d 251 (2006) (Footnote 14 in the Till opinion "means that the market rate should be applied in Chapter 11 cases where there exists an efficient market. But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the Till plurality."); *In re Brice Road Developments, LLC,* 392 B.R. 274, 280–281 (6th Cir. BAP 2008) (an efficient market approach may be utilized where an open, well developed market for loans of the kind between the debtor and secured creditor is shown to exist.).

Here, the parties agree that an efficient market exists for the loan of the kind proposed by the AHC/Debtor Plan. The task is to identify the rate the market would produce for a loan of this type. At trial, the three financial experts each offered their opinions on the market rate of interest for the New Term Loan, including Andrew Yearley of Lazard for the debtors, William Hardy of Houlihan Lokey for the AHC, and Neil Augustine of Rothschild Inc., for the Beal/Icahn parties. A range of interest rates was offered, from the 10% to 12% range opined by Mr. Hardy, to the 12% rate offered by Mr. Yearley, to the 14% to 16½% rate presented by Mr. Augustine. The primary determinant utilized by all three experts was the rate of interest paid by comparable gaming companies.

The choice of gaming comparables offered by each of the experts was vulnerable to criticism. As to the Lazard analysis, Mr. Yearly focused on 11 gaming companies with 15 debt issuances. He selected companies with a similar number of properties (between 1 and 4), operating, for the most part, in one or two markets, with EBITDA averages somewhat comparable to that of the debtors. He included

several local competitors with similar characteristics to the debtors. The interest rates paid by these companies ranged from 5.42% to 17.47%, with an average yield of 11.8%. Mr. Yearly acknowledged that including in his report an implied credit rating for the debtors may have been helpful in comparing the debtors to other gaming companies. In his choice of comparables, he selected several comparables above a "B" rating, although he also utilized several comparables with CCC and CCC + ratings.

Testifying on behalf of the ACH, Mr. Hardy utilized nine comparable gaming companies to arrive at a mean of 9.6% and a median of 8.5% as the weighted average cost of debt for the comparable companies. To arrive at the range of 10% to 12% for his assessment of an appropriate market rate of interest, he imposed a risk factor on the mean of 9.6% to account for the competitive forces in Atlantic City and the region, the low risk ratings of the debtors in most categories of comparison with his comparables, and the relatively weak financial covenants contained in the New Term Loan.[54]

Several of Mr. Hardy's comparables were correctly criticized as substantially larger, more diversified issuers, whose yields were generally lower than those of small, less diversified issuers. For instance, the Isle of Capri, which has 13 casino gaming facilities in 6 jurisdictions, and has international holdings, is carrying $1.2 billion of debt, with a weighted average yield of 6.8% on its debt issue. Ameristar Casinos, Inc., which has 8 properties in 7 jurisdictions, is carrying $1.6 billion of debt. The weighted average cost of its debt is 8.3%.

The Rothschild report used only six gaming comparables, funneling its selection process by choosing regional operators without significant diversification or international operations, and selecting single B corporate credit rating comparables or lower. Included among the six comparables was the Golden Nugget, an admittedly distressed property that is highly leveraged, with a debt to EBITDA ratio of 10.4X, a ratio that is significantly higher than the debtors' ratio will be at emergence from Chapter 11. The Golden Nugget presented a weighted average yield of 15.7%. It was also observed that the comparables selected in the Rothschild report to establish market rate of interest concentrated on Nevada gaming companies, which were particularly hard hit by the recent economic downturn.

It is readily apparent that any comparable selected by a financial expert will differ in some respects from the applicable characteristics of the debtors' financial picture. Notably, there is substantial overlap in the comparables selected by the experts. Of the six comparables selected by Mr. Augustine, two comparables, with interest rates of 13% and 15%, were utilized in Mr. Yearly's report. Four other gaming comparables used by Mr. Augustine for his debt capacity analysis, but not for a calculation of the market rate of interest, were used in the Houlihan Lokey report. These debt issuances had interest rates ranging from 5.9% to 8.7%. As well, three of the gaming comparables used in the Lazard report, with interest rates of 11.9%, 14.6% and 16.8%, were used in the Rothschild report for debt capacity analysis only. Other gaming comparables used by Lazard with lower interest rates were not selected in the Rothschild report. As well, the use by Rothschild of the Golden Nugget, with a very high debt/EBITDA ratio, appears to have been inappropriate.

Two interesting compilations of the various gaming comparables utilized by the

---

**54.** After the close of testimony at confirmation hearings, the New Term Loan proposed in the AHC/Debtor Plan was modified to include a more robust covenant package.

experts were presented. If the Rothschild analysis of gaming comparables for determination of market rate of interest is supplemented with the comparables used in the Rothschild report to determine debt capacity, the resulting mean and median yields are 11.4% and 11.6%, respectively (compared to the 14.3% and 14.8% mean and median relied upon in the Rothschild report). A second compilation of the market yield of all of the comparable companies used by Lazard, Rothschild and Houlihan Lokey in each of their respective expert reports produced a weighted average market yield of approximately 11%. While many factors might differentiate these companies, the market yield suggested by the compilations are consistent with the ranges proposed in the Lazard and Houlihan reports.

> The choice of comparables is a difficult task, performed best by professionals with gaming industry experience. Both Messrs. Yearly and Hardy have such extensive experience. In contrast, Mr. Augustine, who is managing director and the head of Rothschild's North American restructuring group, with extensive experience in financing issues in and out of bankruptcy courts across many industries, has had minimal exposure to the gaming industry, and has never prepared an expert report on the pricing of debt. Mr. Augustine's insights and criticisms of the analysis of the other experts were important. However, his choice of comparables, and the application of the methodologies he used, seemed to reflect a "cherry picking" process, which slanted his conclusions in favor of a higher interest rate.

In addition to reviewing the rate of interest paid by comparable gaming companies, Rothschild's report utilized two additional methodologies, including comparable exit financings and a comparison of debt issuances from companies with similar risk profiles, based on an implied credit rating of CCC to be achieved by the debtors upon emergence from bankruptcy. However, each of these approaches was somewhat discredited. For instance, as to the comparable exit financings, of the seven exit financings selected (among hundreds of others, including exit financings with lower rates), five of the comparables used were obtained by companies other than gaming companies, which shed some doubt about the true comparability of the selections. Mr. Augustine acknowledged that exit financings may not be reflective of market rates, particularly because such financings are sometimes provided by incumbent creditors. In one of the two gaming companies used as comparables, such was actually the case. As to Rothschild's rating-based analysis, an implied rating of CCC was developed by Rothschild, using three of the nine Standard & Poor metrics, while ignoring other salient metrics. Additional problems with the analysis were noted, including an inflated debt balance, and an unexplained differentiation between the use of a "normalized" capital expenditure number but not a "normalized" EBITDA number. Most notably, Mr. Augustine's conclusion that the current market rating for CCC loans is 13.48% was substantially discredited. The actual interest rate on CCC borrowings is a LIBOR rate[55] (currently 25 basis points) plus 1098 basis points, or an interest rate of 11.23%. Mr. Augustine arbitrarily added a LIBOR floor of 2.5% to the actual interest rates charged on CCC borrowings, which was not justi-

---

55. LIBOR or "London Interbank Offered Rate" is defined as "A daily compilation by the British Bankers Association of the rates that major international banks charge each other for large-volume, short-term loans of Eurodollars, with monthly maturity rates cal-

fied.[56] He explained the addition by reference to "swap adjusted rates" and the LIBOR "curve", but his report did not contain this explanation. He also acknowledged that the "swap adjusted rate" would impact on traders in the secondary market rather than on the cost of debt to the borrower, which is the subject of our focus here.

I am not swayed by the arguments advanced by Rothschild and the Beal/Icahn parties that the result of efforts made by the AHC during the case to explore financing opportunities for the debtors is reflective of the appropriate rate of interest to employ here. In October 2009, as the two plans under consideration at that time were progressing, Mr. Hardy ran a two-week process to explore interest in debtor-in-possession or exit financing. He contacted approximately 10 institutions. The only interested party at the time was Wells Fargo, who offered, several months later, a $225 million facility that would have had an "all-in cost" of capital of 12.8%. The testimony presented confirmed that the proposal from Wells Fargo did not represent the outcome of a broadly marketed effort at attracting financing. Mr. Hardy noted that in a successful marketing campaign for another Chapter 11 debtor he recently conducted, he contacted 43 institutions. Similarly, Mr. Augustine acknowledged that in a recent bankruptcy case in which he was involved, he contacted 86 institutions to achieve financing. There was no "full blown financing syndication process" conducted here, by which a meaningful reflection of the appropriate

market rate of interest could be ascertained.

Based on the proofs presented, I conclude that a 12% rate of interest represents the effective market for the New Term Loan proposed in the AHC/Debtor Plan. In reaching my conclusion that the appropriate market rate of interest is 12%, I am cognizant of the fact that the debtors fare poorly on the various risk factor metrics displayed in the Houlihan report. The debtors' poor ratings influence my assessment that the higher end of the Houlihan Lokey conclusion should control.

(ii) *New Term Loan Covenants.*

The Beal/Icahn parties contend that the proponents of the AHC/Debtor Plan have failed to demonstrate that the non-interest rate terms for the New Term Loan are market standard at the present time. An Amended Credit Agreement was filed by the AHC and the debtors after the close of testimony. However, the Beal/Icahn parties contend that many customary creditor protections, such as leverage or interest coverage maintenance covenants, deprive the First Lien Lenders of key market-standard protections, and the added provisions are below-market.

The AHC/Debtor Plan proponents respond that their plan extends maturity by only three years (from December 31, 2012 to December 31, 2015), but nearly doubles the interest rate and provides the lenders with additional covenants not present in the pre-petition loan. Among the lender protections added are "(i) a 50% free cash flow sweep; (ii) a pre-payment premium of 2% for the first six months and 1% for the next 12 months,[57] (iii) the fixing of maxi-

---

culated out to one year. These daily rates are used as the underlying interest rates for derivative contracts in currencies other than the euro." Black's Law Dictionary at 1027 (9th Ed.2009).

**56.** Mr. Augustine did not contest Mr. Hardy's research that only 7 of the 95 loans in the CCC loan index referenced by Mr. Augustine had any LIBOR floor.

**57.** The original loan basically provided for a 2% pre-payment premium through the fourth

mum capital expenditures to 8% of gross gaming revenues, and (iv) a right of first refusal before the Trump Marina can be sold."[58] The amortization rate proposed in the New Term Loan of quarterly payments of 0.25% is the same as in the original Credit Agreement.

While the focus of § 1129(b)(2)(A)(i) is on the price terms and retention of liens contained in the New Term Loan, courts generally agree that the cramdown of secured debt must also "insure the safety of the principal" by other appropriate means that must be dictated by the circumstances of each case. *In re Kellogg Square Partnership*, 160 B.R. 343, 368, n. 47 (Bankr.D.Minn.1993) (citing to *In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985)). The "other appropriate means" refer to the covenants to be included in the loan documents to be issued to a nonconsenting secured creditor. The covenants must serve to protect the lenders' security position. *In re American Trailer and Storage, Inc.*, 419 B.R. 412, 440–42 (Bankr.W.D.Mo.2009). However, the loan documents need not track precisely the covenants in the parties' existing loan agreement. *Id.* Nor must the post-confirmation loan documents be consistent with what the market would require for a new loan. *Id. See also In re P.J. Keating Co.*, 168 B.R. 464, 473 (Bankr.D.Mass. 1994).

The objectors cite to the *Kellogg Square* case for the proposition that a creditor is "entitled to insist on the execution of new security instruments, with content equivalent to what the parties would reasonably negotiate on a loan origination *at the present time*". *In re Kellogg Square Partnership*, 160 B.R. at 368 (emphasis added). Further, the secured lender is "entitled to demand market-standard terms." *Id.* at 369. The pronouncements of the *Kellogg Square* court must be understood in the context of the circumstances of that case. The original credit agreement that was being crammed down was entered into in 1977, sixteen years before the debtor's reorganization. The court was impressed with the significant changes in industry standards for covenants during that time frame. The court noted that "[s]ince 1977, changes in the economy, business practices, and law have created or materially increased risks that were not previously anticipated by the parties, were not covered under the parties' pre-petition contract or perhaps were not even in existence then." *Id.* at 368. The court recognized that the proposed credit agreement must be "sufficient to shelter [the creditor] from the risks inherent in the Debtor's proposal." *Id.*

It must be recalled that the cramdown provision of § 1129(b)(2)(A)(i) provides some flexibility to a proponent in the treatment of the claim of a secured creditor. The proposed New Term Loan is not a negotiated agreement between the parties. Nevertheless, the most fundamental aspect of the New Term Loan is that it must not unduly shift the risk relating to the operations and financial performance of the reorganized debtor, and must be fair and equitable to the secured creditor. *In re D & F Const. Inc.*, 865 F.2d 673 (5th Cir.1989). Here, approximately two and a half years after the inception of the original creditor agreement, the proponents present a New Term Loan that has terms nearly identical to the original agreement, with some enhancements. The maturity date is extended by three years, but the

year of the loan, with no premium required thereafter.

**58.** Joint Post–Confirm. Hearing Memo at 22.

amount outstanding is paid down by about 25%, and the interest rate on the obligation is nearly doubled. The total debt carried by the debtors' enterprise is reduced by nearly $1.4 billion. There are sufficient protections included in the covenants to safeguard the First Lien Lenders against the risk of plan failure.

### d. Is The Plan Otherwise "Fair and Equitable"?

 The Icahn parties correctly contend that mere technical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is "fair and equitable". *See In re D & F Constr., Inc.*, 865 F.2d 673, 675 (5th Cir.1989). To be confirmed, a plan may not treat a dissenting class unfairly, and must not unduly shift the risk of reorganization. *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 346 (Bankr. S.D.Ohio 1992). To determine whether the proposed arrangement imposes impermissible risk shifting upon the primary secured creditor, a court will consider: (i) the debtors' demonstration of feasibility; (ii) the protections and risks to the secured creditor, and (iii) the general reasonableness of the proposals in light of the circumstances. *See In re Kennedy*, 158 B.R. 589, 599 (Bankr.D.N.J.1993). *See also In re EFH Grove Tower Associates*, 105 B.R. 310, 313 (Bankr.E.D.N.C.1989). The objectors argue that here, significant risks are being placed on the secured creditors, while all upside potential in the debtors is reserved for the Second Lien Noteholders, who are acting as new money investors.[59]

 The risks imposed upon the First Lien Lenders are not substantial or unfair. On the effective date, the allowed secured claim of $459 million will be paid down by $125 million, nearly two years before the current maturity date of the debt. The First Lien Lenders will be paid a market rate of interest, with somewhat improved covenants, as compared to the original terms of the loan. As undersecured creditors, the First Lien Lenders are entitled to share in the potential upside of the debtor's continued operations under the § 1111(b) option, which they have selected, but would not otherwise have that opportunity. Contrary to their assertion, the First Lien Lenders are not funding the reorganization. Rather, the AHC members are infusing the debtor with substantial capital, and undertaking the risks associated with this restructuring in the event of failure. As to the First Lien Lenders, the plan is generally fair and equitable.

A corollary to the Icahn parties' "fair and equitable" argument is that the AHC/Debtor Plan violates the absolute priority rule because the First Lien Lenders will not receive payment in full on account of their secured claims, while junior creditors are receiving some distribution under the plan. The objectors' contention in this regard must also be rejected.

 The structure of § 1129(b)(2)(A), (B) and (C) supports the proposition that the absolute priority rule, which proscribes junior claims or interest

**59.** The objectors also contend that the AHC/Debtor Plan does not provide fair and equitable treatment to the First Lien Lenders because it denies them the right to credit bid their debt for the debtor's assets. They argue that the equity acquisition by the AHC constitutes a sale of the assets under § 1129(b)(2)(A)(ii), whereby a secured creditor must have the right to credit bid for those assets under § 363(k). But the AHC/Debtor Plan is not a sale under the second option of § 1129(b)(2)(A). Rather, it proposes a plan, with the debtors as joint proponents, to make deferred cash payments to the First Lien Lenders at present value. No credit bid opportunity is available in this context. *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298 (3d Cir.2010).

from receiving or retaining property under a plan unless senior claims or interest have been satisfied in full, does not apply to secured claims. *See, e.g., Mercury Capital Corporation v. Milford Connect. Assocs., L.P.*, 354 B.R. 1, 14 (D.Conn.2006). Each subsection of § 1129(b)(2) describes the "fair and equitable" requirements for a separate class of claims or interests. Subparagraph (A) describes secured claims; subparagraph (B) pertains to unsecured claims and subparagraph (C) pertains to a class of interests. The absolute priority rule is articulated in subparagraphs (B) and (C), but not (A). *See also In re Arden Properties, Inc.*, 248 B.R. 164, 173–74 (Bankr.D.Ariz.2000). But *see In re Miami Center Associates, Ltd.*, 144 B.R. 937, 941 (Bankr.S.D.Fla.1992) (the absolute priority rule applies to secured creditors). Nevertheless, even if the absolute priority rule may be asserted by secured creditors, the application of the rule " 'does not require sequential distributions (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan.' " *Mercury Capital Corp. v. Milford Connect. Assoc.*, 354 B.R. at 14 (quoting *In re Penn Cent. Transp. Co.*, 458 F.Supp. 1234, 1283 (E.D.Pa.1978)).

Here, the values represented by the First Lien Lenders' claims are fully satisfied by the values distributed under the plan. No absolute priority rule violation exists.

I conclude that the AHC/Debtor Plan meets the requirements of section 1129(a) and (b), and is confirmable, subject to the following modifications:

(A) The plan provision releasing Trump from the Trump Personal Guaranty must be deleted from the plan.

(B) The plan provision releasing the Second Lien Noteholders from liability for any alleged violations of the Intercreditor Agreement must be deleted from the plan.

(C) The plan provision offering the Backstop Parties indemnification must be clarified and limited, per the discussion supra.

(D) The AHC, the Backstop Parties and the Indenture Trustee must apply under section 503(b) for reimbursement of fees and expenses as substantial contributors to the case.

(E) The New Term Loan must be modified to afford the First Lien Lenders a 12% rate of interest, and an 1111(b) premium.

(F) The plan is confirmable subject to approval of DIP financing.

## V. *The Beal/Icahn Plan.*

The Beal/Icahn Plan is challenged as unconfirmable on various grounds, including sections 1129(a)(1), (a)(2), (a)(3), (a)(4), (a)(9), (a)(11) and 1129(b).

### A. *Section 1129(a)(1).*

The plan provisions challenged here as violative of "applicable provisions of this title," 11 U.S.C. § 1129(a)(1), include the exculpation and indemnification provisions in the Bank/Icahn Plan.

#### 1. *Exculpation.*

The UST objects to language included in Section 10.6—Exculpation of the Beal/Icahn Plan as overly broad.[60] The UST notes that only acts "amounting to willful

---

60. The releases specified in ¶ 10.5 of the Beal Bank/Icahn plan are similar to those provided for in the AHC/Debtors' plan, and likewise, were not objected to by any party and appear to be consistent with applicable law. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir.2000).

170

misconduct, intentional fraud or criminal conduct" are excluded, whereas the exclusions should also cite "gross negligence." *PWS Holding*, 228 F.3d at 246–47. Beal Bank/Icahn acknowledges the objection and states that it is "prepared to modify the carve-out of that provision so that it applies to acts or omissions constituting 'gross negligence, willful misconduct or fraud,' consistent with the UST's objection papers." Beal Bank/Icahn Post–Trial Brief at 60, ¶ 92.

Subject to the contemplated modification, the exculpation provision does not violate § 1129(a)(1).

### 2. *Indemnification.*

The UST also contends that the proposed indemnification provision in Section 5.3(p) of the Beal Bank/Icahn Plan is too broad and too vague. The proposed indemnification applies only to Backstop Parties who are signatories to the Backstop Agreement. That agreement to provide funding for the anticipated Rights Offering will never be implemented, because the Rights Offering was conditioned upon the contemplation that "a hearing to consider confirmation of the AHC/Debtor Plan does not occur." Beal/Icahn Plan, § 5.3(q). The confirmation hearing occurred. The indemnification clause complained of will not be activated. The objection is overruled.

### B. *Section 1129(a)(2).*

■ Section 1129(a)(2) requires that "[t]he proponent of the plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). The legislative history refers to section 1125, regarding disclosure, as an example of one of those "applicable provisions." H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6368, 5787, 5912. The Third Circuit

has held that "§ 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of § 1125." *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir.2000). *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr.S.D.Tex.2009) ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

AHC/Debtors contend that the Beal/Icahn Plan misrepresented the operational and management experience of the Icahn Parties in the gaming industry, misrepresented Icahn's proposed personal involvement, and adopted conflicting positions on the value of the Trump brand. The objectors contend that neither Icahn nor Icahn Partners has any real "operating experience", and that by stating in their disclosure statement that "Icahn Partners has extensive experience with the ownership and operation of gaming assets generally and in Atlantic City [and] has a strong interest in owning and operating the Trump casinos," Beal/Icahn has "blatantly misrepresent[ed]" its management experience. Debtors contend that confusing "investment" experience with operating experience is misleading. In addition, the debtors contend that the Beal/Icahn parties misrepresented the debtors' ability to service debt and the amount of debt that the debtors will have post confirmation.

Notwithstanding the approval of the Beal/Icahn disclosure statement, the issue of adequate disclosure may be revisited at the confirmation hearing. *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr.S.D.N.Y.1990). Here, the highlighted statements do not rise to a level that is violative of the disclosure requirements under § 1125 or § 1129(a)(2). The statements simply reflect the Icahn Partners' ownership and pending interests in

other casinos and gaming facilities, like the Sands and the Tropicana, without unduly focusing on operational experience. There is no evidence here to suggest that any voters were improperly swayed to vote in favor of the Beal/Icahn Plan, or against the AHC/Debtors Plan, as a consequence of these statements. The objection is overruled, and I conclude that the requirements of § 1129(a)(2) have been satisfied.

### C. *Section 1129(a)(3).*

Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). *See* discussion, *supra* at 142.

The objectors contend that the Beal/Icahn Plan seeks to improperly manipulate the bankruptcy process in an attempt to gain control and ownership of the debtors. They point to various inconsistencies in the positions asserted by the First Lien Lenders, first claiming to be undersecured and then asserting that their claim is oversecured. They claim that the proposed distribution to the Second Lien Claims and general unsecured creditors has always been illusory.

The cases cited by the objectors to support their position that the Beal/Icahn Plan fails on good faith grounds are inapposite here. In *In re Koelbl*, 751 F.2d 137 (2d Cir.1984), the court declined to find bad faith where an employee proposed a reorganization plan that transferred ownership of the debtor to the employee, but there was no evidence of breach of confidentiality, or breach of the duty of loyalty, or dishonesty by the employee. And in *In re Allegheny Intern., Inc.*, 118 B.R. 282 (Bankr.W.D.Pa.1990), the court denied confirmation on bad faith grounds where an alternative plan proponent selectively purchased claims to block voting in certain classes, improperly sought to take control

of the debtors, and improperly used insider information. The *Allegheny* case was awash with facts and allegations of wrongdoing by the competing proponent to manipulate both the process and the debtor's operations.

Here, the focus is the fairness and viability of the plan proposed by the First Lien Lenders, not their "ulterior motives" to protect their claims and their collateral, and to make a profit, all of which are proper and not violative of good faith. In initially offering a plan, Beal Bank merely acted to preserve its collateral and to ensure that it would recover on its claim. Thereafter, it determined to accept Icahn's offer for 51% of the debt plus the put/call agreement, which contemplated the Icahn takeover of the claim.

The Icahn parties purchased a portion of the Beal Bank debt and became a co-proponent of a competing plan. There are no creditors in any class that are unfairly discriminated against. There are no allegations of insider trading or fraudulent activities. Neither Icahn nor Beal Bank sought to take any improper control over the debtor. Icahn purchased the debt at 92.5% of par with the intent to make a profit. That, in and of itself, is not improper or illegal. Both the buyer and seller were informed and noticed. There was no delay or pressure to sell. The purchase of those shares did not change the vote against the AHC/Debtors' plan for that class. It only changed the name on the debt. As to changes in positions during the case, all parties in this case, including the AHC, have taken conflicting positions in the case as alliances shifted and circumstances evolved. There is no evidence to suggest manipulation of the process or wrongdoing by the Beal/Icahn parties or on their behalf.

██ Lastly, the AHC/Debtor parties contend that the approximately $13.9 million in cash and subscription rights offered to the Second Lien Note Holders and the General Unsecured claims in the Beal/Icahn Plan was always illusory. because it was conditioned on at least 50% participation and the absence of a contested confirmation hearing. From the time the Beal/Icahn Plan was first proposed, a competing plan had been submitted and the proponent of that plan, AHC, held more than 61% of the Second Lien Notes and was obviously committed to its own plan.

██ There is no requirement that claim holders in a junior position receive value in a reorganization plan, where there is no value to reach that position. The Code requires only that the proposal be in good faith, not result in unfair discrimination, and be fair and equitable. The absolute priority rule is not challenged here. The First Lien Lenders are undersecured, and no recovery is offered to junior interests. The fact that the proposed plan provided for a de minimis recovery in the unlikely event that the Second Lien Noteholders chose to abandon the AHC/Debtor Plan is of no moment.

I conclude that the Beal/Icahn Plan is in conformance with Chapter 11 reorganization goals, is proposed in good faith and not by any means forbidden by law.

D. *Section 1129(a)(4).*

██ Section 1129(a)(4) requires that "any payment" made or to be made by the plan proponent or the debtor for services "in or in connection with" the plan or the case be approved by or "subject to the approval of" the bankruptcy court as "reasonable." *See In re Congoleum Corp.*, 414 B.R. 44, 59 (D.N.J.2009). *See* discussion, *supra* at 145.

Under the Beal/Icahn Plan, New Co. will offer one year salary severance packages to certain officers and directors of TER, triggered upon "a termination by the employer without cause." Fifth Amended Joint Plan of Reorganization, ¶ 5.9(c). The UST contends that these severance packages are violative of section 503(c)(2), which proscribes severance payments to insiders, unless the payment is part of a program that is generally applicable to all full-time employees, and the amount of the payment is not greater than 10 times the amount of the mean severance pay given to non-management employees during the calendar year.[61]

The Beal/Icahn parties respond that the severance package objection should be overruled because any such obligation would be incurred and paid by the Reorganized Debtors after the effective date of the Beal/Icahn Plan, making section 503(c) inapplicable.

I must conclude that the severance payments contained in the Beal/Icahn Plan are violative of section 503(c)(2) because they do not meet the requirements of that section. The provision is presently incorporated into the plan. The plan proposes to retain the debtors' officers through the Effective Date of the plan, at which time they "will be offered one year severance arrangements." Plan, ¶ 5.09(c). Of course, the Plan's provisions that the officers of New Co will be determined by New Co's board of directors is valid. If any of

---

61. The UST also objects to the payment of the Backstop Parties' fees without court approval, and the payment of fees and expenses incurred by the proponent during the case. As to the former, the issue is moot, because no Rights Offering occurred. As to the latter, provision for such payment is made in this court's Final Cash Collateral Order, and will be revisited in connection with the quest by the AHC/Debtor parties for recharacterization.

the officers is either offered a contract to continue or terminated at that point or thereafter, business judgments can be made about severance arrangements without reference to section 503(c)(2). But the plan provision providing for severance packages must be stricken from the plan.

### E. *Section 1129(a)(9).*

■ The Beal/Icahn plan imposes, as a "Condition Precedent to the Effective Date", a "cap" on the administrative expenses sought through the plan. Section 9.1(h) of the Beal/Icahn plan provides that "the occurrence of the Effective Date" will be subject to the "satisfaction or waiver" of certain conditions precedent, including the circumstance that the aggregate amount of the section 9.1(h) expenses exceeds $15 million or exceeds legal or other professional fees of $10 million.[62] Those expenses include the individual and aggregate amounts of the administrative expenses claims allowed by the court, § 503(b)(2–5) expenses, allowed priority tax claims in excess of $5,862,000, any other allowed priority claims and any allowed secured claims that do not arise under capitalized leases. The allowed amount of the 9.1(h) expenses "shall be acceptable to Icahn Partners in its sole discretion." In effect, this provision imposes a cap or limitation on the amount of fees to be paid for 1129(a)(9) expenses, and is therefore violative of the (a)(9) confirmation requirement.

Section 1129(a)(9)(A) requires holders of administrative claims to be paid "cash equal to the allowed amount of such clam," unless the claimant agrees to different treatment.[63] The Code clearly requires the full payment of all allowed administrative expenses. *See In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 224 (3d Cir.2002) ("In a Chapter 11 case, a court cannot confirm a distribution plan unless the plan provides full cash payment of all § 503(b) administrative expense claims or the claim holder agrees to different treatment."); *In re Christopher*, 28 F.3d 512, 516 (5th Cir. 1994) ("[T]he plan of reorganization cannot be confirmed under § 1129(a)(9)(A) unless the plan provides for the payment in cash and in full of persons holding "claims" for administrative expenses under §§ 503 and 507."); *In re Goody's Family Clothing,*

---

62. Section 9.1(h) provides:

> The occurrence of the Effective Date (except as set forth in Section 5.4 hereof (and then as of the time set forth therein)) of the Plan is subject to the satisfaction or waiver of the following conditions precedent:
> . . .
> (h) the individual and aggregate amounts of each of the items covered by clauses (i) through (v) below (the "Section 9.1(h) Expenses"), as determined by the Bankruptcy Court, shall be acceptable to Icahn Partners in its sole discretion, if and only if the aggregate amounts of all Section 9.1(h) Expenses (A) exceed $15,000,000.00 or (B) include legal or other professional fees exceeding $10,000,000.00: (i) any Allowed Administrative Expense Claims pursuant to Section 2.1 of the Plan; (ii) any claims for compensation and reimbursement of expenses allowed pursuant to Section 2.2 of

the Plan; (iii) that portion (if any) of the amount of any Allowed Priority Tax Claims pursuant to Section 2.3 of the Plan in excess of $5,862,000 (and only to the extent of such excess); (iv) any Allowed Other Priority Claims; and (v) any Allowed Other Secured Claims that do not arise under capitalized leases.

5th Amended Joint Plan at § 9.1(h) at 31–32.

63. Section 1129 provides in relevant part:
> (9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
> (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9)(A).

*Inc.*, 401 B.R. 656, 662 n. 6 (D.Del.2009). The Code does not permit a plan to cap the amount to be paid toward administrative expenses without the consent of the claimants.

Similarly, the cap on allowed priority tax claims contained in section 9.1(h) violates section 1129(a)(9)(C). Section 1129(a)(9)(C) provides that allowed unsecured priority tax claims, of a kind specified in § 507(a)(8), will receive regular installment payments in cash "of a total value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9)(C). A Chapter 11 plan cannot be confirmed unless it provides for the full payment of all priority tax claims. *See In re Ribs–R–Us, Inc.*, 828 F.2d 199, 202 (3d Cir.1987); *In re G–1 Holdings Inc.*, 420 B.R. 216, 266 (D.N.J.2009) ("Section 1129(a)(9)(C) requires that payment of priority tax claims shall be made in the full amount as of the Effective Date of the Plan."). The Beal/Icahn Plan may be confirmed only if the cap on administrative and priority expenses is removed from the plan.

### F. *Section 1129(a)(11).*

The ACH/Debtor Parties contend that the Beal/Icahn Plan is not feasible on various grounds. First, certain provisions in the plan offer escape clauses by which the proponents may be relieved of the obligations they have undertaken. For instance, the "Icahn Penalty Payment", whereby the proponents agree to escrow $50 million and to forfeit that amount if regulatory approvals are not achieved within 270 days of the Confirmation date, will not be forfeited if the proponents, in their sole discretion, determine not to close for other reasons. Similarly, the proposed DIP financing has not been documented, and presumably may be withdrawn at will. As further evidence of the illusory nature

of the plan, the objectors maintain that the Beal/Icahn parties lack a business plan for future operations and that Icahn lacks management and operational experience. They point to the poor performance record that Icahn Partners has had in other endeavors. Second, they contend that Icahn does not have rights to the Trump brand, insisting that the license and servicing agreements have terminated and are not assumable. Third, the objectors highlight the delay and uncertainty anticipated to obtain the necessary regulatory approvals for the Icahn Parties, particularly because of undue economic concentration concerns and anti-trust issues. Debtors contend that all of these factors combine to defeat the feasibility of the Beal/Icahn Plan.

### 1. *Commitment to Plan and Business Operations.*

The AHC/Debtor parties are correct that the Beal/Icahn Plan provides opportunities to withdraw the Plan for various reasons. For example, a condition precedent to the plan is the acceptance by the proponents of determinations by the bankruptcy court regarding allowed administrative, priority and secured claims. Plan § 9.1(h). That provision cannot be sustained. Any subsequent rulings by the court to determine claims, as necessary, must serve to bind the proponents, and cannot be a basis to withdraw the plan. The proponents' only recourse in that circumstance would be to appeal any determination in the normal course. To approve such a provision would create havoc in the process of confirming a plan, only to see it withdrawn if the proponent is dissatisfied with a post-confirmation ruling by the bankruptcy court. Section 9.1(h) must be deleted from the plan.

As to the general commitment of the Beal/Icahn parties to go effective, I am convinced that they intend to do just that. It is true that the proponents have not

come forward with a specific business plan regarding the future operations of the debtors' casino and properties. Nevertheless, the proponents' commitment has been demonstrated by their continued involvement in this intense and protracted litigation, and by the expressions of Carl Icahn, during his deposition, and Vincent J. Intrieri, Senior Managing Director of Icahn Parties, during his testimony at trial, both of whom expressed unequivocal intention to proceed with the plan. Beyond § 9.1(a) mentioned above, the opportunities to withdraw the plan do not defeat a finding of feasibility for the Beal/Icahn Plan.

### 2. *Trademark License and Servicing Agreements.*

■ The Beal/Icahn Plan proponents contend that the prepetition Trademark Licensing Agreement authorizing the debtors to use the Trump brand, and the Trump Servicing Agreement, have not terminated, and are assumable and assignable. Even if we accept the proposition that the agreements have terminated, or that the agreements are not assumable and assignable, the Icahn parties contend that the casinos can readily be re-branded. At trial, Vincent Intrieri, Senior Managing Director of Icahn Partners, testified that the cost of re-branding the casinos has been estimated at $15 million. The proponents maintain that there is no credible evidence to suggest that the debtors' casinos could not be operated successfully without the Trump brand.

Substantial issues are presented regarding whether the agreements in question have terminated, and whether they may be assumed and assigned. I need not resolve these issues here, because I am convinced that the Beal/Icahn Plan is feasible even without the benefit of the Trump brand. The anticipated cost of the rebranding would be easily absorbed by the Reorganized Debtors' available cash on the Effec-

tive Date. While there might be a temporary disruption to the debtors' operations, there can be no question that the casinos could operate successfully without the Trump brand, particularly on a platform of a debt-free enterprise. If the Beal/Icahn Plan is confirmed, and the proponents seek to continue to use the Trump brand, they may move for a resolution of the issue. The prospect that the contracts may not be assumable is not an impediment to a finding of feasibility here.

### 3. *Regulatory Approval.*

■ The feasibility of the Beal/Icahn Plan depends upon the prospect that the plan proponents can achieve licensure for the Reorganized Debtors from the New Jersey Casino Control Commission ("CCC"), and can withstand antitrust scrutiny by the Federal Trade Commission.

#### a. *Undue Economic Concentration.*

The issue for the plan proponents is whether the acquisition of the Trump Casinos by the Icahn parties, who now own the Tropicana in Atlantic City, will cause undue economic concentration in the Atlantic City marketplace, causing the licensure of the Icahn Parties to be jeopardized.

New Jersey law provides, in relevant part, that:

> No person shall be issued or be the holder of a casino license if the issuance or the holding results in undue economic concentration in Atlantic City casino operations by that person.

N.J.S.A. 5:12–82(e). Section 19:43–3.1(b) of the New Jersey Administrative Code, in turn, provides as follows:

> For purposes of N.J.S.A. 5:12–82e and this section, "undue economic concentration" means that a person would have such actual or potential domination of the casino gaming market in Atlantic City as to substantially impede or sup-

press competition among casino licensees or adversely impact the economic stability of the casino industry in Atlantic City.

N.J. Admin. Code § 19:43–3.1(b). Section 19:43–3.1(c) of the New Jersey Administrative Code delineates a host of criteria to be considered by the CCC in determining whether the issuance or holding of a casino license will result in undue economic concentration. In its Opinion and Order approving the Harrah's acquisition of Caesar's Entertainment in 2005 (the "Harrah's Decision"), the CCC described its task in analyzing the issue as follows:

> Beyond market share, section 82e analysis involves broad scrutiny of factors that include current and projected financial condition of the casino industry; market conditions and characteristics, e.g. level of competition, consumer demand and market concentration; potential impact on the development of the casino industry and Atlantic City; barriers to entry, and impact on consumer interests.

*See* Opinion and Order on Amended Petition of Harrah's Entertainment, Inc. and Harrah's Operating Company, Inc. Seeking Declaratory Rulings Relating to the Acquisition of Caesars Entertainment, Inc. (N.J. Casino Control Commission May 24, 2005).

When Harrah's applied in 2005 for approval to acquire a casino license for the operations of two Caesars properties in Atlantic City, the focus of the CCC was whether the issuance of the additional casino licenses for the Caesars' properties to Harrah's would constitute undue economic concentration under N.J.S.A. 5:12–82(e). The Herfindahl–Hirschman Index ("HHI"), an anti-trust tool adopted by the United States Justice Department and the Federal Trade Commission ("FTC") to measure economic concentration in those

markets where mergers are occurring, was referenced by the CCC. *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 241 (Bankr.D.N.J.2000). The federal merger guidelines urge extreme caution if a merger even in a moderately concentrated market causes a 100 point increase in the HHI. *Id.* In its opinion, issued on May 24, 2005, the CCC indicated that after the Caesars' acquisition by Harrah's, the HHI for Atlantic City would be in the "highly concentrated range" and the casino space HHI would rise by over 200 points. Nevertheless, the CCC reflected that numerical figures are not determinative, and that other factors existed, including the qualitative observation that "vigorous competition currently exists in Atlantic City," and that "due to the very nature of the casino industry, any attempt at non-competitive behavior quickly becomes unprofitable and thus is unlikely to occur". *Id.* at 9. Additionally, in both the Harrah's Decision and in an earlier opinion in regarding the proposed licensure of Park Place in its acquisition of Sands Hotel and Casino in 1999, the CCC reflected that encouraging new capital investment and development in Atlantic City is an important legislative policy which must be balanced against competing policies, such as the fostering of economic competition in the market place. N.J.S.A. 5:12–1(b)(13), *see* Harrah's Decision at 13. *See also Greate Bay* at 241. The licenses for Harrah's were approved, with a cautious note that "further expansion by all market players, especially those with multiple properties, will warrant close Commission scrutiny." Harrah's Decision at 14.

In this case, several experts testified on the issue of undue economic concentration. Mr. James Hurley, a former Commissioner and Chair of the New Jersey Casino Control Commission, testifying on behalf of the Beal/Icahn Plan, opined that the acqui-

sition of the Trump properties by the Icahn Parties would not result in a finding by the Commission of undue economic concentration. Dr. William Hall, an economist who also testified on behalf of Icahn, acknowledged that the Atlantic City casino industry was already highly concentrated, and that the level of concentration as measured by the HHI index would go up by approximately 400 points post-acquisition. Nevertheless, he too opined that the acquisition would not result in undue economic concentration because a highly competitive post-merger environment would still prevent anti-competitive acts. Dr. Martin Perry, an economist who testified on behalf of the AHC/Debtor parties, did not offer an opinion on whether the acquisition would result in a Commission finding of undue economic concentration, but noted that the post-acquisition HHI index would be a red flag for the CCC, and that it was his opinion that if such an acquisition were proposed, there would be a hearing conducted on undue economic influence that would raise "serious concerns" and would "very likely take several months."

The task here is to determine whether there is a reasonable prospect for licensure by the Beal/Icahn parties in connection with the proposed acquisition of the Trump casinos. Both parties agree that the market is already highly concentrated and that the acquisition under the Icahn/Beal plan would send the HHI index for this industry in Atlantic City soaring to record high levels. But the numbers and statistics alone have not proven to be determinative to the CCC in the past. The Beal/Icahn parties contend that if their plan is confirmed by the bankruptcy court, the CCC will not reject licensure in light of the significant economic opportunity for the Trump casinos to reorganize and maintain their economic viability. The CCC's earlier opinions reflect their position that en-

couraging new capital investment in Atlantic City is a highly valued legislative policy which must be balanced against competing policies such as the fostering of economic competition in the market place. *See* N.J.S.A. 5:12–1(b)(13). All parties agree that the acquisition contemplated under the Icahn/Beal plan would require an in depth hearing by the CCC before a licensee could be issued.

I conclude that for section 1129(a)(11) purposes, there is a reasonable prospect of success for Icahn/Beal to achieve licensure to own and operate the Trump casinos in the event of the confirmation of the Icahn/Beal plan, but that such licensure would likely be delayed by a CCC hearing on undue economic concentration that would at a minimum take several months to complete.

b. *Anti–Trust Concerns.*

Additional concerns were raised by the AHC/Debtor parties regarding the feasibility of the Beal/Icahn Plan in light of federal antitrust regulations, including whether the plan would withstand antitrust scrutiny under the Hart–Scott–Rodino Antitrust Improvements Act of 1976 ("HSR"), 15 U.S.C. § 18a, 90 Stat. 1383, 1390, and whether the notification requirements and waiting periods required by HSR will cause lengthy delays that could frustrate the consummation of the plan.

With respect to the plan's ability to withstand general antitrust scrutiny, when an acquisition such as the one proposed in the Beal/Icahn Plan is presented, the FTC is required to assess the likelihood that the acquisition may confer market power on the merging parties or among the remaining participants in the market, and relies on the HHI Index of market concentration as a starting point to interpret market

share data.[64] In a transaction such as the one contemplated in the Beal/Icahn Plan, there will be a waiting period of at least 30 days while the FTC investigates potential anticompetitive effects before such a transaction can be completed, and that waiting period might be extended if additional information is sought. *See* 15 U.S.C. § 18a(b)(1) and (c).

Here, Dr. Hall touching on antitrust concerns, opined that the Icahn acquisition of the Trump Casinos would not be deemed violative of antitrust regulations by the FTC. According to Dr. Hall, the FTC would most likely consider not only competition within the Atlantic City gaming market, but would also consider competition from outside Atlantic City in its review, and would likely reach its conclusion within the initial 30 day waiting period without requesting an extension of time. Dr. Hall recounted that the last merger transaction in Atlantic City, the Harrah's–Caesars transaction, took approximately eleven months to complete, because the FTC extended its investigation, and the CCC waited to begin their consideration until after the FTC completed its investigation.

I conclude on this record that a confirmation of the Beal/Icahn Plan would likely be followed by a thirty-day FTC investigation, which would likely be followed in turn by hearings before the CCC on the issue of undue economic concentration, but that neither agency would ultimately impede the Beal/Icahn Plan from being implemented.

Most notable on the issue of the feasibility of the Beal/Icahn Plan is the fact that the enterprise will be debt-free going forward, with a $45 million DIP facility and an $80 million cash infusion to enhance its liquidity and to meet its operational needs. The conclusion is inescapable that the Beal/Icahn plan is not likely to be followed by a liquidation, or the need for further financial reorganization of the debtors.

### G. *Section 1129(b).*

■ The AHC/Debtor parties challenge the Beal/Icahn Plan on § 1129(b) grounds, claiming that the plan is not fair and equitable to creditors junior to the First Lien Lenders. In particular, they claim that under the Beal/Icahn Plan, which contemplates that all of the debtors' equity would be conveyed to the First Lien Lenders, the First lien Lenders would receive a greater than 100% recovery on their claims, a result proscribed by § 1129(b)(2)(B)(ii). *See, e.g., In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612–16 (Bankr.D.Del.2001); *In re MCorp Financial Inc.*, 137 B.R. 219, 225 (Bankr. S.D.Tex.1992). The objectors' challenge in this regard must be overruled.

In support of their own plan, the AHC/Debtor objectors have put forth a TEV for the debtors of less than the value of the First Lien Lender claim, and have omitted a value for the Florida litigation on the basis of its speculative nature. The objectors cannot persuasively contend that the debtors' TEV is $459 million for purposes of their plan, but something higher for purposes of the Beal/Icahn Plan. It is true that if the Beal/Icahn Plan is confirmed, other creditors will receive nothing, and Icahn Partners will receive 100% of the equity in the Reorganized Debtors, in addition to any accompanying upside if the company succeeds. But they also hold the risk. Obtaining all of the equity in

---

**64.** The FTC follows the analytical framework and standards outlined in the Horizontal Merger Guidelines (the "Guidelines") to evaluate the likelihood that anti-competitive ef-fects will result from a merger. *See* Horizontal Merger Guidelines, U.S. Dept. Justice and Fed. Trade Comm'n, Apr. 2, 1992 (revised Apr. 8, 1997).

exchange for debt equitization, equity contribution and DIP financing does not constitute a violation of the absolute priority rule, or the fair and equitable requirement otherwise.

### H. *Indenture Trustee Objection.*

The Indenture Trustee objects to the lack of a provision in the Beal/Icahn plan that provides for the continuation of the payment of the Indenture Trustee's fees and expenses, designated as adequate protection payments under the Final Cash Collateral Order dated March 23, 2009, until the Effective Date of the Beal/Icahn Plan, if that plan is confirmed. The Trustee also objects to the cancellation of the Indenture, as provided for in § 5.7 of the Beal/Icahn plan, without the preservation of the right to a charging lien and the right to a priority in the payment of fees upon any distribution to the Noteholders. The Trustee contends that this provision improperly cancels the Indenture as to non-debtor parties. Finally, the Trustee objects to the bar date for administrative claims that is set for 7 days after the date of confirmation. The Trustee requests that the date be extended to 30 days.

If the Beal/Icahn Plan is confirmed, the Final Cash Collateral Order will be enforced. As to the charging lien and priority payment references by the Indenture Trustee, these concerns are moot, because there will be no distribution to the AHC or to other noteholders under the Beal/Icahn Plan.

The Indenture Trustee correctly reflects that the Beal/Icahn Plan should provide in section 5.7 that the cancellation of the Indenture applies only to the debtors' obligations and does not affect the relationship between the Indenture Trustee and the Noteholders and guarantors otherwise. In addition, the bar date for the filing of administrative expense claims should be extended to thirty (30) days after the date of confirmation.

I conclude that the Beal/Icahn Plan meets the requirements of section 1129(a) and (b), and is confirmable, subject to the following modifications:

(A) The plan provision for exculpation must be modified to provide for acts or omissions constituting gross negligence, willful misconduct or fraud.

(B) The plan provision providing for a severance payment to certain employees must be stricken.

(C) The plan provision placing a cap on administrative and priority expenses, and requiring acceptance of post-confirmation claims determinations of the bankruptcy court by the proponents, must be stricken.

(D) The plan provision cancelling the Indenture dated May 20, 2005, applies only to the debtors' obligations, and does not affect the relationship between the Indenture Trustee and the Noteholders and guarantors.

(E) The bar date for filing administrative claims must be extended to thirty (30) days after the date of confirmation.

### VI. *Other Joint Objections.*

Various other parties have come forward with objections that apply to both the AHC/Debtor Plan and the Beal/Icahn plan, including former shareholders and a personal injury claimant.[65]

### A. *Former Shareholder Objections.*

A group of former shareholders of the debtors, who are now general unsecured

---

**65.** Oracle USA, Inc.'s objections have been withdrawn.

creditors, objects to the confirmation of both plans. They assert that the plans provide disparate treatment to the unsecured creditor class. Specifically, they point to the proposed administrative expense treatment of prepetition holders of unredeemed chips and tokens, and the prior orders of the court authorizing the payment of critical vendors at the outset of the case. They claim that pre-petition unredeemed chips and tokens should be treated as general unsecured claims. In addition, they claim that neither plan accounts in its liquidation analysis for Chapter 5 causes of action, which should only inure to the benefit of unsecured creditors.

As part of the debtors' request for first day orders, debtors sought authorization to pay certain prepetition customer related claims and obligations, including a category of "gaming claims," which included prepetition casino chips and tokens in the public domain. The debtors explained that it would be a tremendous cost to the estate, a major disruption to their business, and nearly impossible to distinguish between casino chips and tokens that were distributed prepetition from those that were distributed postpetition. As well, the debtors' inability to satisfy these claims would have a negative impact on their reputation, and would severely damage their reorganization efforts. The court entered an order approving the payments on February 19, 2009.

On February 20, 2009, an order was entered approving the payment of certain identified critical vendors. The continuation of the debtors' gaming and hospitality business depended on their ability to continue their operations and to maintain their reputation and customer loyalty during the bankruptcy process. Without a regular and continuous supply of foods, room amenities, or adequate gaming equipment, among many other types of supplies, the debtors' operations would have been irreparably harmed. It was essential that the debtors maintain their business relationships with vendors and service providers who were identified as the most essential to the debtors' operations. The critical vendors were required to maintain their credit arrangements with the debtors as a condition of the receipt of payments on account of prepetition claims. An amended order was entered on June 16, 2009.

The former shareholders are correct that both plans, each of which have left undisturbed the treatment of gaming claims and critical vendors, discriminate against other general unsecured creditors, who are receiving only a nominal return under the AHC/Debtor Plan, and no distribution under the Beal/Icahn Plan. The question is whether each plan discriminates unfairly in this regard. The discrimination here is clearly supported by reasonable bases, was necessary for the debtors' reorganization, was proposed in good faith, and is proportionate to the need for the discrimination. *See, e.g., In re Hawaiian Telcom Communications,* supra at *31. In each case, there was more than adequate justification for, and no unfair discrimination behind, the payments made to these creditors. The objection of the former shareholders in this regard is overruled.

The former shareholders' objection with respect to Chapter 5 causes of action, although couched as a fair and equitable argument, is based on the "best interests of creditors" test in § 1129(a)(7). Section 7.7 of the AHC/Debtor Plan specifically preserves all causes of action for the benefit of the Reorganized Debtors rather than for the benefit of unsecured creditors. The unsecured creditors' claims, to the extent allowed, would receive their pro rata cash distribution and their pro rata

share of subscription rights provided for in the plan. *See* AHC/Debtor Plan §§ 1.26, 1.41, and 4.5. But there is no provision for the distribution of any Chapter 5 recoveries to unsecured creditors. Likewise, there is no provision in the Beal/Icahn Plan reserving these potential causes of action for the benefit of the unsecured creditors.

In the hypothetical Chapter 7 liquidation analysis required under section 1129(a)(7), the Chapter 5 causes of action would inure to the benefit of the unsecured creditor body before the debtors would recover.[66] *In re Transport Group, Inc.,* No. 93–30015, 2007 WL 1083887 (Bankr.W.D.Ky. Apr.9, 2007) (debtor is the last party to receive a distribution under 726); *In re Butler,* 42 B.R. 777, 787 (Bankr.E.D.Ark.1984)(unsecured creditors receive before debtors in a 726 analysis). The best interest of creditors test requires that each creditor not accepting the plan receive at least the amount they would have received if the debtor were liquidated. *In re American Family Enters.,* 256 B.R. 377, 403 (D.N.J.2000). Each plan proponent will be required to amend its plan to provide that if any Chapter 5 causes of action are pursued and result in any recovery, that recovery must inure to the benefit of the general unsecured creditors.

### B. *Kahn Objection.*

Eugene Kahn objects to both plans as not being fair and equitable to personal injury claimants such as him, and as not being filed in good faith. He objects to the nominal recovery he will receive under the AHC/Debtor Plan, and the lack of any

recovery under the Beal/Icahn Plan, when gaming claims and professional fees and expenses are being paid in full. Mr. Kahn asserted a $1 million claim against the debtors, which was reduced to $337,000, inclusive of medical expenses, at a mandatory non-binding personal injury arbitration. After a 40% reduction for comparative negligence, Mr. Kahn's claim against the debtors was determined to be $202,000.

The debtors self-insure claims up to $500,000 under their comprehensive liability policies, and up to $1 million under their general casualty insurance policies. Accordingly, Mr. Kahn's claim is not covered by the debtors' insurance coverage. His claim was properly classified and afforded the same treatment as other general unsecured creditors in both plans. The approval given to the debtors to satisfy certain specified gaming claims was addressed above. There is no support for the contention that the plans were filed in bad faith, or that the treatment afforded here is not fair and equitable. While Mr. Kahn's frustration with the nominal recovery to unsecured creditors is certainly understandable, his objection must be overruled.

### VII. *Competing Plans.*

 I have concluded that both the AHC/Debtors' Plan and the Beal Bank/Icahn Plan are confirmable. Under § 1129(c), "[I]f the requirements of subsections (a) and (b) of this section [§ 1129] are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."

---

66. *See In re Affiliated Foods, Inc.,* 249 B.R. 770, 788 (Bankr.W.D.Mo.2000) (hypothetical liquidation "requires an estimation of the value of all of the bankruptcy estate's assets, including such hard to determine values as disputed and contingent claims, *id.,* the potential disallowance of claims (under § 502(d)), *id.,* the probability of success and value of causes of action held by the estate, and, in this case, potential preference actions.").

11 U.S.C. § 1129(c). *See In re Orchards Village Investments, LLC,* No. 09–30893–rldll, 2010 WL 143706, *21 (Bankr.D.Or. Jan.8, 2010) ("Based on the clear terms of § 1129(c), ... primary consideration [is given] to the preferences of creditors and equity holders."); *In re Milford Connecticut Associates, L.P.,* 389 B.R. 303, 304 (Bankr.D.Conn.2008), *aff'd,* 404 B.R. 699 (D.Conn.2009); *In re Coram Healthcare Corp.,* 315 B.R. 321, 351–52 (Bankr.D.Del. 2004). *See also In re River Village Assocs.,* 181 B.R. 795, 807 (E.D.Pa.1995) ("Under the language of § 1129(c), a bankruptcy court is only obligated to consider the preferences of the creditors and equity interests, not obey them."). It is incumbent upon the court to "make the choice that is most beneficial to all creditors and equity security holders." *In re River Valley Fitness One Ltd. P'ship,* No. 01–12829–JMD, 2003 WL 22298573, *9 (Bankr. D.N.H. Sep.19, 2003) (citing to *In re Sound Radio, Inc.,* 93 B.R. 849, 859 (Bankr.D.N.J.1988)).

■■■ Beyond considering the preferences of creditors and equity security holders, the court must consider: "(1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan." *In re Holley Garden Aparts., Ltd.,* 238 B.R. 488, 493 (Bankr. M.D.Fla.1999). *See also In re ASARCO LLC,* 420 B.R. 314, 332 (S.D.Tex.2009); *Orchards Village Invests.,* 2010 WL 143706 at *21; *In re Internet Navigator Inc.,* 289 B.R. 128, 131 (Bankr.N.D.Iowa 2003); *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 245 (Bankr.D.N.J.2000). As to

the types of plans presented, both plans contemplate the continued operation of the Reorganized Debtors.[67] The focus is on the treatment of creditors [68] the feasibility of the plan, and the creditors' preferences.

As to the treatment of creditors, both plans provide for a full recovery to First Lien Lenders, one through conversion of the debt to equity, and the other through deferred cash payments at present value. But the two plans differ markedly otherwise, particularly as to the treatment of Second Lien Noteholders. Except for providing a pro rata share of $500,000 to the Convenience Class, the Beal/Icahn Plan provides no distribution to any other stakeholders in the case. In contrast, the AHC/Debtor Plan provides for a nominal recovery of cash, subscription rights and liquid stock to the Second Lien Noteholders and General Unsecured Creditors. More importantly, the plan provides, to a large number of the Second Lien Noteholders, (approximately 61% of the Noteholders), the opportunity to receive the only value that is left in the case after satisfaction of the First Lien Lenders' claims. That value is the potential future benefit of the reorganization, if the reorganization succeeds. The Ad Hoc Committee is making a substantial payment of $225 million for the opportunity to participate in the future upside potential of the debtors, which would otherwise inure to the exclusive benefit of the First Lien Lenders. The treatment of creditors favors the AHC/Debtor Plan in this regard.

The feasibility factor clearly weighs in favor of the Beal/Icahn Plan. The proposed

---

**67.** The AHC/Debtor Plan proponents promote their plan as a true reorganization that benefits all creditors while labeling the Beal/Icahn Plan as a liquidating plan akin to a foreclosure, benefitting only the First Lien Lenders. It is true that only the First Lien Lenders benefit from the Beal/Icahn Plan, but it is not a liquidating plan. The plan contemplates the

debtors' financial restructuring, with ongoing business operations.

**68.** The interests of the equity security holders under each plan are cancelled and extinguished, and are therefore not considered in this analysis.

deleveraging of the debtors and infusion of capital in the form of equity, leaving the debtors with a clean balance sheet and adequate capital to rebuild the business, is certainly advantageous. *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. at 247. As well, although the Icahn Parties have no specific plan for the manner in which the operations of the Tropicana in Atlantic City, which they now own, and the debtors will co-exist, it is recognized that consolidation of gaming companies can produce substantial opportunities for revenue enhancements and cost savings. *Id.* at 247–48.

The feasibility of the Beal/Icahn Plan is marred somewhat by several factors. There is uncertainty about the opportunity of the Reorganized Debtors to utilize the Trump brand in its continuing operations. I have concluded that the plan is feasible nevertheless, because the casinos may be rebranded at a cost (approximately $15 million) that can be borne by the proponent. However, the rebranding would cause temporary but substantial disruption of the business operations of the debtors.

As well, there is agreement among the experts who testified at trial that although the prospect for ultimate regulatory approval of the Beal/Icahn Plan are reasonably good, there will be a delay of several months, including an initial FTC investigation period, followed by hearings before the CCC, on the issue of undue economic concentration. While the liquidity of the debtors during this time would be protected by DIP financing provided by the proponents, the continued uncertainty and

lack of finality of the reorganization process would hinder the debtors' opportunity to move forward more quickly with its rehabilitation plans.

While the AHC/Debtor Plan is less attractive on the issue of the company's balance sheet at its emergence from Chapter 11, leaving the company with about $334 million of debt, I have concluded that the plan is feasible as proposed, and presents other favorable aspects that enhance its feasibility. Most notably, the Reorganized Debtors under the AHC/Debtor Plan would continue to benefit from the use of the Trump brand, and the future support of Donald and Ivanka Trump, free from potential litigation, rebranding costs and disruptions, and the associated business risks with losing the brand. The prospect of prompt regulatory approval is stronger for the AHC/Debtor Plan, and the plan has the support of a significant number of debtors' employees, as reflected by the submission of the employees union.[69] The members of the AHC have worked closely with debtors' management for several months, and share a joint vision of a business direction for the company.

The prospect that the Reorganized Debtors would emerge from bankruptcy completely deleveraged is highly desirable, causing the feasibility element to favor the Beal/Icahn Plan. However, the factors discussed above mitigate somewhat the finding in favor of the Beal/Icahn Plan on the feasibility element.

The most significant element in choosing between two confirmable plans is the stat-

---

**69.** In its submission in connection with confirmation hearings, UNITE HERE Local 54 expressed a preference for the AHC/Debtor Plan over the Beal/Icahn Plan. The union is concerned that confirmation of the Beal/Icahn Plan would result in consolidation of ownership and a disincentive to keep each property in operation. The closing of any of

the facilities would put Local 54 employees out of work. Local 54 also seeks to retain its long standing relationship with the existing Trump management team. Finally, the Union believes that the AHC/Debtor Plan demonstrates a greater commitment to the ultimate success of the reorganization.

utory direction to the court to "consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). The preference of creditors is reflected in the voting results. *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. at 245 (Bankr. D.N.J.2000).

As expected, the First Lien Lender Secured Claims filed 5 ballots, totaling $485,062,701.38, all in favor of accepting the Beal/Icahn Plan and rejecting the AHC/Debtors' plan. Likewise, as expected, the DJT Claimholders voted unanimously to accept the AHC/Debtors Plan. The votes of neither class is determinative of the creditors' preference here. Nor are the voting results of the General Unsecured Creditors and the Convenience Class particularly helpful in identifying creditor preferences. The General Unsecured Creditors voted overwhelmingly, at least 70% in number and over 93% in amount, to reject the plans proposed by both proponents. The Convenience Class voted convincingly in favor of accepting the Beal Bank/Icahn plan, approximately 89% in number and 90% in amount, while their vote for the AHC/Debtor Plan did not constitute formal acceptance by the class, 11 U.S.C. § 1126(c), with approximately 58% in number and amount voting to accept. The voting of the Convenience

Class is less significant in light of the AHC/Debtors' subsequent amendment of their plan to provide for the same treatment as proposed in the Beal/Icahn Plan, a pro rata share of $500,000.[70] This leaves us with the class of Second Lien Noteholders, the largest creditor constituency in the case, holding in excess of $1.2 billion of claims.

As to the AHC/Debtor Plan, the Second Lien Noteholders cast 1,374 ballots, representing over $1.1 billion in claims. Over 96% in number and 79.72% in amount voted in favor of the AHC/Debtors Plan. In contrast, the Second Lien Noteholders cast 1,316 ballots in the Beal/Icahn Plan, representing over $1 billion in claims. The Second Lien Noteholders voted 90% in number and 84% in amount to reject the Beal/Icahn Plan.[71]

The end result of the voting is that an overwhelmingly number of creditors voted in favor of the AHC/Debtor Plan and against the Beal/Icahn Plan. Of course, it must be recalled that both the AHC members and the Icahn parties obviously support their own plans. But the significant support for the AHC/Debtor Plan by the largest creditor constituency, coupled with the treatment of creditors and feasibility considerations noted above, compels the conclusion that the AHC/Debtor Plan, as modified, should be confirmed.[72] Confir-

70. Beal Bank/Icahn contends that the voting reflects a "meaningful preference for the Beal/Icahn Plan among the disinterested creditors," pointing out that approximately 90% of the Convenience Class voted in favor of the Beal Bank/Icahn Plan and only 58% voted in favor of the AHC/Debtor Plan. Of those who voted to approve both plans, 84% indicated a preference for the Beal Bank/Icahn Plan. As noted above, these numbers, representing a very small subset of creditors in the case, are not determinative here. The voting took place prior to the amendment of the AHC/Debtor Plan, which now provides the same treatment in both plans to the Convenience Class.

71. The AHC/Debtor Plan proponents submit that Classes 4 and 5 should be deemed to have rejected the Beal/Icahn Plan because they will not receive a distribution. In fact, both classes have actually rejected the plan by their votes.

72. If the proponents of the AHC/Debtor Plan do not accept the required modifications of the plan, or if DIP financing for that plan is not approved, the Beal/Icahn Plan may be confirmed.

mation of the AHC/Debtor Plan will allow the debtor to shed approximately $1.4 billion in secured debt, to pay the First Lien Lenders in full, and to offer to creditors the opportunity to participate in the upside potential of the debtors.

Debtors' counsel is instructed to submit an order in conformance with this opinion.